```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4    UNITED STATES OF AMERICA          )
                                        )
 5                                      )
                                        )
 6    vs.                               )  No. 1:11-cr-10199-DPW-1
                                        )
 7                                      )
      RAZVAN PASCU, also known as       )
 8    Razvan Anghel,                    )
                                        )
 9                     Defendant.       )

10

11    BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

12

13                    MOTION TO SUPPRESS - DAY ONE

14

15

16          John Joseph Moakley United States Courthouse
                          Courtroom No. 1
17                        One Courthouse Way
                          Boston, MA 02210
18                  Monday, September 19, 2011
                          9:35 a.m.
19

20

21

                      Brenda K. Hancock, RMR, CRR
22                       Official Court Reporter
            John Joseph Moakley United States Courthouse
23                        One Courthouse Way
                          Boston, MA 02210
24                        (617)439-3214

25
```

```
 1        APPEARANCES:
 2
              UNITED STATES ATTORNEY'S OFFICE
 3            By:  Scott Garland, AUSA
                  Adam J. Bookbinder, AUSA
 4            1 Courthouse Way
              Boston, MA 02210
 5            On behalf of the United States of America.

 6            FEINBERG & KAMHOLTZ
              By:  Mathtew H. Feinberg, Esq.
 7            125 Summer Street, 6th Floor
              Boston, MA 02110
 8            On behalf of the Defendant.

 9

10        ALSO PRESENT:

11            INTERPRETER:  Maria Bola-Ferriero  Language: Romanian

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2       Testimony of:          Direct  Cross  Redirect  Recross

3       OFFICER STEVEN ALLEN

4         By Mr. Garland        6              107
          By Mr. Feinberg              45
5
        OFFICER THOMAS FLYNN
6
          By Mr. Bookbinder     111
7         By Mr. Feinberg              127

8

9                       E X H I B I T S

10      No.              Description          For ID    In Evd.
        Govt's
11
        1                Photo                          126
12
        Defendant's
13
        1A thru D        Photos                         47
14      2                Booking Document               97
        3                Secret Service Report          107
15      4

16
        A                Chart                77
17

18

19

20

21

22

23

24

25

1           (The following proceedings were held in open court

2   before the Honorable Douglas P. Woodlock, United States

3   District Judge, United States District Court, District of

4   Massachusetts, at the John J. Moakley United States Courthouse,

5   One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6   Monday, September 19, 2011):

7           THE CLERK:  All rise.

8       (The Honorable Court entered the courtroom at 9:35 a.m.)

9           THE CLERK:  This Honorable Court is now session.  You

10  may be seated.

11          This is Criminal Action 11-10199, United States versus

12  Razvan Pascu.

13          Would the interpreter please rise and raise your right

14  hand.

15              (Interpreter duly sworn by the Clerk)

16          THE COURT:  Well, I guess, Mr. Bookbinder, are you

17  going to take the laboring oar here?

18          MR. BOOKBINDER:  Yes, your Honor.  Actually,

19  Mr. Garland is going to take the lead right now.

20          THE COURT:  So, I will hear your first witness.

21          MR. GARLAND:  All right.  Thank you, your Honor. Your

22  Honor, we are going to call Officer Steve Allen first.

23          MR. FEINBERG:  I assume everyone is sequestered.

24          THE COURT:  I will leave it to counsel to enforce

25  that, but there has been a request for sequestration, so it

1    applies to both sides.

2            MR. GARLAND:  Yes, your Honor.  They are outside and

3    they've been instructed not to talk about their testimony.

4            THE COURT:  And there is no case agent involved in

5    this?

6            MR. GARLAND:  There is a case agent.  The case agent

7    is actually going to get him right now.

8            THE COURT:  Is the case agent going to be a percipient

9    witness?

10           MR. GARLAND:  He is a percipient witness but to the

11   interrogation.  We don't plan on introducing his testimony.

12           THE COURT:  All right.  Do you have any problem with

13   that?

14           MR. GARLAND:  That's Special Agent Ray Arcand.

15           THE COURT:  If you could take the witness stand, sir.

16           Is that agreeable, Mr. Feinberg?

17           MR. FEINBERG:  That's agreeable.  As I understand

18   it -- I am going to introduce a video of an interrogation and

19   he was present there, but I gather that that's the only way in

20   which he is involved.

21           THE COURT:  So, he can stay in the courtroom as the

22   case agent?

23           MR. FEINBERG:  Yes.

24           THE COURT:  You may proceed.

25           OFFICER STEVEN ALLEN DULY SWORN BY THE CLERK

1          THE CLERK:  Please state and spell your full name for

2    the record.

3          THE WITNESS:  Steven Allen.  S-T-E-V-E-N.  Last name

4    Allen, A-L-L-E-N.

5          THE CLERK:  You can be seated.

6          THE COURT:  If you can take the stand, take a seat

7    there.

8          MR. GARLAND:  May I proceed, your Honor?

9          THE COURT:  You may.

10         MR. GARLAND:  Thank you.

11                        DIRECT EXAMINATION

12   BY MR. GARLAND:

13   Q.   Mr. Allen, what's your occupation?

14   A.   I'm employed by the City of Cambridge as a police officer.

15   Q.   For how long have you been a police officer?

16   A.   Approximately 3 1/2 years.

17   Q.   What are your normal duties?

18   A.   Basic patrol.

19   Q.   Let's talk about April 30th, 2011.  Around 2:00 in the

20   afternoon were you on duty?

21   A.   Yes, sir.

22   Q.   What were you doing?

23   A.   I was on patrol.

24   Q.   And, just generally, what were you doing around that time

25   on patrol?  Were you driving around, were you standing

1    anyplace?  Where were you?

2    A.   I was in the North Cambridge area by Alewife Brook Parkway

3    in my cruiser.

4    Q.   Did you respond to a call at around 2:00 that afternoon?

5    A.   I did.

6    Q.   What was the report?

7    A.   The report around that time -- ECC, which is our

8    communication dispatch, gave information of a suspicious person

9    going in and out of the bank.

10        THE COURT:  Just a moment.  Officer Allen, if you

11   could speak more directly into the microphone and maybe move it

12   closer to you and you to the microphone.

13        THE WITNESS:  Sure.  Sorry.

14   BY MR. GARLAND:

15   Q.   Sir, was there a description of what suspicious activity

16   was occurring?

17   A.   Yes.

18   Q.   What was it?

19   A.   The description was a male going in and out of the bank,

20   removing his hood, putting his hood back on, removing

21   sunglasses and putting the sunglasses back on each and every

22   time he entered and exited the bank.

23   Q.   And was there a description of the suspect beyond the

24   clothing going on and off?

25   A.   There was.

1    Q.    What was the description?

2    A.    The description at the time was a brown-type vest, a blue

3    sweater, blue jeans and some sneakers.

4    Q.    Was there any mention of a car in the report that came

5    over the radio?

6    A.    There was.

7    Q.    How did the car come up in the call?

8    A.    After I spoke with the reporting person.

9    Q.    That is, once you reported to the scene?

10   A.    I'm sorry.  Yeah, that's correct.

11   Q.    All right.  So, how long did it take you to get to the

12   scene?

13   A.    Approximately 30 seconds to -- somewhere around there, I

14   believe.

15   Q.    Can you describe where it is that you went to?

16   A.    I arrived to the scene at 176 Alewife Brook Parkway.

17   Q.    What type of location is that?

18   A.    That's an outside strip mall, sir.

19   Q.    Can you describe what it is you saw when you got there, as

20   far as the buildings, and the configuration, sidewalks and

21   parking lot?

22   A.    It's right off of I believe Route 16, it is.  You enter

23   the mall off of Route 16.  It's a strip mall with stores.

24   Q.    What types of stores are there?

25   A.    McDonald's, Radio Shack, Eastern Bank, PetSmart, Staples,

1   T.J. Maxx, Whole Foods, Olympia Sports.

2   Q.   Where is the bank in relation to those stores?  Was it at

3   one end, in the middle or somewhere in between?

4   A.   Somewhere in between.

5   Q.   And was there a parking lot attached to that as well?

6   A.   Outside parking lot, correct.

7   Q.   So, what was the weather like, by the way?

8   A.   Clear, sunny.

9   Q.   Did you have any difficulty seeing anything at that time?

10   A.   Not at all.

11   Q.   So, once you get there, what do you see?

12   A.   As I entered the parking lot towards the strip mall, I

13   observed a male fitting the description that Communications had

14   broadcast.

15   Q.   And in which direction was that person traveling?

16   A.   The person was leaving towards the bank area heading

17   towards the T.J. Maxx area.

18   Q.   Was that to you, away from you, perpendicular to you?

19   A.   As I was proceeding down the strip mall on the street in

20   my cruiser, he was heading towards me but away from the Eastern

21   Bank.

22   Q.   Was he coming from the sidewalk adjacent to the stores?

23   A.   Correct.

24   Q.   Can you describe the person that you saw at that time?

25   A.   Describe the clothing attire that he wore that day?

1    Q.   Yes.

2    A.   I believe it was a brown vest, a blue sweater, a pair of

3    jeans and sneakers.

4    Q.   And what gender, age, height?

5    A.   I'm sorry.  A white male approximately 30 to 35 years old,

6    about 5'10", I believe.

7    Q.   Could you see the person's face right when you got there

8    to the scene?

9    A.   As I was driving, this individual was on a cell phone at

10   the time, so it was kind of shielded by the cell phone.

11   Q.   Was the cell phone between you and the person's face?

12   A.   Correct.

13   Q.   Were you in a cruiser at that time?

14   A.   Yes.

15   Q.   Was it marked or unmarked?

16   A.   It was a marked cruiser, sir.

17   Q.   And were you in uniform or out of uniform at that time?

18   A.   I was in full uniform, sir.

19   Q.   What happened after you saw that person?

20   A.   After I seen the individual, I made an attempt to go back

21   around to further identify the individual when I was stopped by

22   the -- or flagged down by the reporting person.

23   Q.   Did you talk to the reporting person?

24   A.   I did.

25   Q.   What was the reporting person's name?

1    A.    Allan Maffeo, I believe.

2    Q.    What did the person say to you?

3    A.    The reporting person stated that -- he gave out the same

4    description that ECC broadcast and basically stated the

5    suspicious activity he observed by the description he gave of

6    the person.

7         MR. FEINBERG:  Could I ask that the witness slow down

8    a little bit?  I am having a hard time picking it up.

9         THE COURT:  If you could, Officer, speak a little bit

10   more slowly and a little bit more distinctly.

11        THE WITNESS:  Sure, no problem.

12        INTERPRETER BOLA-FERRIERO:  Thank you, your Honor.  I

13   really appreciate it.

14   BY MR. GARLAND:

15   Q.    So, I believe that you said that the person repeated the

16   description of the call of the suspicious behavior that you had

17   already heard; is that correct?

18   A.    That's correct.

19   Q.    At that time did the reporting person tell you anything

20   about a car?

21   A.    He did.

22   Q.    What did he say about the car?

23   A.    He pointed to a motor vehicle that he observed the

24   individual going in and out of.

25   Q.    Did you see the car when he pointed it out?

1   A.   I did.

2   Q.   Did you go to the car right at that point?

3   A.   I did not.

4   Q.   At some point during your time there, did you go to the

5   car?

6   A.   Yes.

7   Q.   What type of car was it?

8   A.   A gray Chrysler 300 with New York tags.

9   Q.   Do you remember what the tag number is?

10  A.   I can't recall.

11  Q.   Is there anything that would help you recall what the tag

12  number is?

13        MR. FEINBERG:  I will stipulate to the tag number.

14        THE COURT:  So, if you want to just read the tag

15  number in.

16        MR. GARLAND:  Thank you, your Honor.  New York plate

17  FHW4206.

18  BY MR. GARLAND:

19  Q.   How far away from the Eastern Bank was the car?

20  A.   I would say approximately 60 to 80 yards, I believe.

21  Q.   Did the reporting person point directly to any particular

22  person within the area as the person that he had seen going in

23  and out of the ATM and going to and from the car?

24  A.   Yes.

25  Q.   To whom did he point?

1   A.   The individual that he described walking down the sidewalk

2   of the strip mall.

3   Q.   Were you able to locate the person again?

4   A.   Yes.

5   Q.   What did you do?

6   A.   At the time this individual was heading back towards my

7   direction from the T.J. Maxx area, and I exited my vehicle and

8   asked if I could speak to him.

9        MR. FEINBERG:  I'm sorry.  Did you say you exited?  I

10   didn't hear the word.

11        THE COURT:  Yes.

12        THE WITNESS:  I'm sorry.  Exited, yes.

13   BY MR. GARLAND:

14   Q.  So, you left your vehicle and went over and talk to the

15   person.  How did you signal to the person that you wanted to

16   talk to them?

17   A.   I left my vehicle and I approached him and identified

18   myself as a Cambridge Police Officer, and I just asked if I

19   could speak to him in English.

20   Q.   And what did the person say?

21   A.   The person said, "Yes."

22   Q.   In what language?

23   A.   English.

24   Q.   Did the person have a hood up or sunglasses on or off?

25   A.   At the time I was speaking to the individual he had no

1    sunglasses, and his hood was off.

2    Q.   Were you able to see the person's face then?

3    A.   Yes.

4    Q.   How long did you wind up spending with that person?

5    A.   The entire time or just that initial interview?

6    Q.   The entire time that you were at the scene.

7    A.   Three to four hours, I believe.

8    Q.   Do you think you could recognize that person today?

9    A.   Yes.

10   Q.   Do you see that person in court today?

11   A.   Yes.

12   Q.   Can you point to that person and describe a distinctive

13   article of clothing that that person is wearing?

14   A.   Yes.  The individual right here sporting what appears to

15   be a beige or tan shirt with white long johns under it

16   (indicating).

17        MR. GARLAND:  Your Honor, we ask that the record

18   reflect that Officer Allen has identified the defendant as the

19   person he was speaking to that day.

20        THE COURT:  It will without objection.

21        You may proceed.

22   BY MR. GARLAND:

23   Q.   So, did you learn who that person was?

24   A.   After he produced some identification, yes.

25   Q.   So, when you first came up to the person, did you handcuff

1    him?

2    A.    No.

3    Q.    Did you pat frisk him?

4    A.    At some point.

5    Q.    But not initially; is that correct?

6    A.    That's correct.

7    Q.    And when you first go up to him and start talking to him,

8    did you tell him whether he was free to go or not free to go

9    anywhere?

10   A.    He wasn't detained at the time.  I didn't tell that him he

11   was not free to go.

12           MR. FEINBERG:  I'm sorry.

13           THE COURT:  If you could speak just a little bit more

14   distinctly.

15           MR. FEINBERG:  I am also trying to deal with

16   background.

17           THE COURT:  Because we have translation it's

18   particularly important.

19           THE WITNESS:  Sorry about that.  Sure.  No problem.

20   Sorry.

21           THE COURT:  If you could repeat your answer.

22           THE WITNESS:  Sure.  At the time I did not tell him

23   that he was not free to go.

24           MR. GARLAND:  Your Honor, if I may --

25   BY MR. GARLAND:

1    Q.    Officer Allen, would you like some water that's right next

2    to you at all?

3    A.    Not at the time, thank you.

4    Q.    So, you went up to him and asked if you could speak with

5    him, he said, "Yes."  How did the conversation go?

6    A.    We had a dialogue.

7    Q.    What did you talk about?  What did you say, what did he

8    say?

9    A.    I just asked him what he was doing in the area.

10   Q.    What did he say?

11   A.    He stated he was waiting for a friend named Roberta.

12   Q.    When you talked to him and asked him this, what language

13   were you speaking?

14   A.    English.

15   Q.    Did he appear to understand what you were saying?

16   A.    Yes.

17   Q.    Were you able to understand what he said?

18   A.    Yes.

19   Q.    What else did you talk to him about?

20   A.    About Roberta, about when Roberta was arriving.  Just a

21   dialogue initially about Roberta.

22   Q.    Did you ask him about whether he was by himself or with

23   anybody else?

24   A.    Yes, I did.

25   Q.    What did he say?

1    A.    He replied he was by himself.

2    Q.    Did you ask him about whether he was from around

3    Cambridge?

4    A.    Yes, I did.

5    Q.    What did he respond?

6    A.    He stated that he was not from around Cambridge.

7    Q.    Did he say where he was from?

8    A.    Yes.

9    Q.    Where?

10   A.    He said he was from New York.

11   Q.    Did he specify where in New York?

12   A.    No.

13   Q.    Did you ask him about the car that you had seen or about

14   any car?

15   A.    I did.

16   Q.    What did you ask him about the car?

17   A.    I asked if he drove a motor vehicle to the location we

18   were at.

19   Q.    What did he say?

20   A.    He said he did.

21   Q.    Did you ask him to point out where that motor vehicle was?

22   A.    I did.

23   Q.    What did he respond?

24   A.    He responded he couldn't remember where he parked his

25   motor vehicle but pointed in a direction he may have parked it

1    at.

2    Q.    How many cars were in the parking lot around that time?

3    A.    Many.  I mean, the parking lot was pretty much full.

4    Q.    Do you recall how many times did the reporting person,

5    Mr. Maffeo, say that he had seen that suspicious person going

6    to and from that car?

7    A.    A couple of times.

8    Q.    Did you ask the defendant for any identification?

9    A.    I did.

10   Q.    Did he produce any?

11   A.    Yes.

12   Q.    What did he produce?

13   A.    He produced a passport and some other form of

14   identification card.

15   Q.    What nationality was the passport?

16   A.    Romanian.

17   Q.    The other type of ID, was it a Massachusetts driver's

18   license or anything that you had seen before?

19   A.    Not that I had seen before.

20   Q.    Did those identities match the defendant's name and

21   appearance?

22   A.    Yes.

23   Q.    Was this the time that you learned that the defendant was

24   Razvan Pascu?

25   A.    That's correct.

1   Q.   What happened after this initial conversation?  Did

2   anybody else arrive at the scene?

3   A.   Yes.

4   Q.   Who?

5   A.   Other Cambridge officers arrived to assist me.

6   Q.   Can you list who those officers were?

7   A.   Officer Marlin Rivera, Officer Dave Gamble, Officer Matt

8   Price.  That's all I can recall at this point.

9   Q.   Do you think that there was anybody else who was there?

10  A.   After speaking with Pascu, yes, the detectives arrived

11  shortly after.

12  Q.   Was any part of the conversation that you just related to

13  the Court done in any language other than English?

14  A.   Only English.

15  Q.   And was the defendant responding in anything other than

16  English?

17  A.   Only English.

18  Q.   Again, did he appear to have trouble understanding you?

19  A.   Not at all.

20  Q.   Did you have trouble understanding the defendant?

21  A.   No.

22  Q.   When the officers arrived, what did you do?

23  A.   I relayed the dialogue that I had with Mr. Pascu.

24  Q.   Did they do anything?  Where did they go at that point?

25  A.   At that time we searched the area for a satchel and

1    sunglasses that was given out by the reporting person that

2    Mr. Pascu was supposed to have in his possession.

3    Q.    When you say "given out," do you mean that that had been

4    identified as being with the defendant?

5    A.    Yes.

6    Q.    Did anybody stay with the defendant at that time?

7    A.    Yes.

8    Q.    Who?

9    A.    Myself.

10   Q.    Did you talk to Mr. Pascu, the defendant, any further

11   during that time?

12   A.    Yes.

13   Q.    What did you talk to him about?

14   A.    Mr. Pascu and I continued to have a dialogue of his

15   business that he was conducting in the mall area.

16   Q.    And who did he say that he was supposed to meet?

17   A.    A lady by the name of Roberta.

18   Q.    Did you ask him about where he was supposed to meet this

19   Roberta?

20   A.    Yes, I did.

21   Q.    Where did he say?

22   A.    He said in the parking lot of the mall somewhere in that

23   area.

24   Q.    Was he any more specific than that?

25   A.    No.

1    Q.   How big is this strip mall?

2    A.   A couple of hundred yards, if not more.

3    Q.   Did they have any means of communicating with each other?

4    A.   Initially he --

5         MR. FEINBERG:  Objection.

6         THE COURT:  I take it to be did he indicate in

7    response to some question whether or not they had a means of

8    communicating.

9         MR. GARLAND:  Yes, your Honor.

10        THE COURT:  All right.

11        THE WITNESS:  I'm sorry.  Can you repeat the question?

12   I'm sorry.

13   BY MR. GARLAND:

14   Q.   Did you ask him about whether he and Roberta had a means

15   of -- a way of communicating?

16   A.   Yes.

17   Q.   What was that means of communication?

18   A.   Telephone, he said.

19   Q.   Did you ask him about what Roberta's phone number was?

20   A.   I did.

21   Q.   What was the number that he gave you?

22   A.   He couldn't produce it.

23   Q.   Did you ask him whether he could remember it off the top

24   of his head?

25   A.   I did.

1    Q.    And what was his response?  Was he able to remember it?

2    A.    No.

3    Q.    Did you talk to him about how Roberta was supposed to

4    arrive at the location, at the strip mall?

5    A.    Yes.

6    Q.    What did you ask him and what did he respond?

7    A.    I asked him how Roberta was arriving to the location, was

8    it by motor vehicle, train or bus.

9    Q.    Did he respond?

10   A.    He did.

11   Q.    What did he say?

12   A.    He said he doesn't know.

13   Q.    Did you ask him how he had met this Roberta?

14   A.    Yes.

15   Q.    What did he respond?

16   A.    He stated that he met Roberta in New York at a pub.

17   Q.    In New York at a pub?

18   A.    That's correct.

19   Q.    And that they were supposed to meet in Cambridge on that

20   day; is that correct?

21   A.    That's correct.

22   Q.    You had seen Mr. Pascu with a cell phone.  Did you ask him

23   about that cell phone and what number he was using to contact

24   Roberta?

25   A.    Yes.

1    Q.    What did you ask him and what did he respond?

2    A.    I asked him if he could produce the cell phone number that

3    he was using.

4    Q.    And what did he say?

5    A.    He stated he couldn't remember her cell phone number.

6    Q.    At this point in the conversation or in the events what

7    were your impressions about the defendant and whether he was

8    answering you truthfully?

9              MR. FEINBERG:  Objection, your Honor.

10             THE COURT:  I will receive it.  You may answer the

11   question.

12   A.    At the time I was confused, as his answers were

13   implausible and evasive.

14   BY MR. GARLAND:

15   Q.    When you first responded to the incident and as you were

16   talking to the defendant, what were your concerns as you were

17   there, your law-enforcement concerns?

18   A.    I'm sorry.  Can you rephrase the question?  I'm sorry.

19   Q.    What did you feel like you were investigating at that

20   time?

21   A.    At the time I wasn't too sure, but I know that something

22   was going on, and due to Mr. Pascu's answers, you know, being

23   evasive and implausible, I just continued to see what was going

24   on, to learn more about the events.

25   Q.    Earlier you said that at some point you did a pat frisk of

1    the defendant.  When did you do the pat frisk?  Was it before

2    or after the events that we just talked about, the

3    conversations?

4    A.    After.

5    Q.    How much after?

6    A.    I'm not too sure.  It was after -- I mean, it was after,

7    you know, continuous dialogue.  Sometime after.

8    Q.    Can you describe what you did in order to do the pat

9    frisk, any conversations you had with him beforehand and the

10   procedure that you used?

11   A.    Sure.  I asked -- or I told the defendant that we were

12   going to search him for my safety and others' safety, and at

13   that time we conducted a pat frisk.

14   Q.    When you told him that, did he respond in any particular

15   way?

16   A.    He said, "Yes," and just nodded his head.

17   Q.    Did he appear to understand what you were saying?

18   A.    Yes.

19   Q.    Did he appear frightened in any way?

20   A.    No, not at all.

21   Q.    Did you go through the pat frisk, and, if so, were there

22   any results to it?

23   A.    Yes, we conducted a pat frisk, and at the time during the

24   pat frisk a black hat fell out from inside of his brown vest in

25   between his sweater and brown vest.

1          INTERPRETER BOLA-FERRIERO:  What?

2          THE COURT:  What fell out of the vest?

3          THE WITNESS:  It was a black baseball cap.

4          INTERPRETER BOLA-FERRIERO:  Thank you, your Honor.

5    BY MR. GARLAND:

6    Q.   Did you see the sunglasses that had been reported by the

7    reporting person?

8    A.   No.

9    Q.   Did you see the hood or the hoodie that had been reported

10   by the reporting person?

11   A.   Yes.

12   Q.   Where was the hoodie?

13   A.   He was sporting it.  He was wearing it.

14   Q.   Okay.  And did the reporting person say anything about any

15   sort of a bag at all that he had seen?

16   A.   Yes.

17   Q.   Did you see the bag that the reporting person had seen?

18   A.   No.

19   Q.   After the pat frisk, what did you do?

20   A.   I can't recall.  I would have to refer back to my report.

21   I can't recall.

22   Q.   Would looking at your report help to refresh your

23   recollection?

24   A.   Yes.

25          MR. GARLAND:  Your Honor, may I take a second?

1          MR. FEINBERG:  Which report?

2          MR. GARLAND:  Your Honor, we have several reports that

3    Officer Allen wrote.  I am going to hand one to -- it is the

4    one that says page -- I think it is page 16 of 38 up at the

5    top.  If I might hand a copy up to Mr. Allen?

6          THE COURT:  Are these attached to the Memorandum?

7          MR. GARLAND:  I believe that they are, yes.

8          THE COURT:  So, until it is actually introduced, I

9    will work from the Memorandum, and it is being offered only for

10   purposes of refreshing his recollection, in any event, right?

11         MR. GARLAND:  That's correct, your Honor.

12         May I approach the witness, your Honor?

13         THE COURT:  Yes.

14         THE WITNESS:  Thank you.

15                      (Pause)

16   BY MR. GARLAND:

17   Q.   Officer Allen, does that refresh your recollection or

18   would it assist you to look at any of the other reports that

19   you looked at?

20   A.   Yes.  Is there another report that I can take a look at?

21         MR. GARLAND:  May I approach the witness, your Honor?

22         THE COURT:  You may.

23         THE WITNESS:  Thank you.

24         MR. FEINBERG:  Could I have a moment, your Honor?

25         THE COURT:  Sure.

1    (Atty. Feinberg conferred with the defendant off the record)

2    BY MR. GARLAND:

3    Q.   Officer Allen, has looking through those reports refreshed

4    your recollection as to what you did after the pat frisk?

5    A.   Yes.

6    Q.   What did you do after the pat frisk?

7    A.   After the pat frisk I just remember being aware of ATM

8    skimmings in the Cambridge area.

9    Q.   You said you remembered ATM skimmings in the area.  Could

10   you elaborate?  How did you become aware of ATM skimming in the

11   area?

12   A.   Yes.  I was first made aware of it through our department,

13   through bulletins and our roll call, and I remember it real

14   freshly, because there was an ATM I was actually using on a

15   regular basis that they were actually putting skimming devices

16   on.

17   Q.   What did you understand a skimming device to be and to do?

18   A.   Basically obtain personal information and extract U.S.

19   currency.

20   Q.   Personal information from what?

21   A.   From your personal bank card.

22   Q.   And were there any reports as to who was responsible or

23   was suspected responsible for ATM skimmings in the area?

24   A.   The bulletins indicated they suspected it was a group of

25   Romanian descent.

1    Q.   At any point did you read the defendant his Miranda

2    rights?

3    A.   I did.

4    Q.   How soon after the pat frisk was that?

5    A.   Very, very shortly after.

6    Q.   In what language did you read them to him?

7    A.   English.

8    Q.   Did you observe him having any difficulty understanding

9    you?

10   A.   He didn't appear to be, no.

11   Q.   Did he make a response as to whether he wished to waive

12   his rights and to continue talking to you?

13   A.   No.

14   Q.   At this point was he in custody at all?

15          MR. FEINBERG:  Objection.  I think that's for the

16   Court to determine, whether he was in custody or not.

17          THE COURT:  Well, I will hear what he thinks was the

18   circumstance.

19   BY MR. GARLAND:

20   Q.   At that time was he in custody?

21   A.   No, sir.

22   Q.   Had you handcuffed him?

23   A.   No, sir.

24   Q.   Was he in the back of a vehicle?

25   A.   No, sir.

1    Q.   Was he being restrained by yourself or any other officer?

2    A.   No, sir.

3    Q.   By the way, where were the other officers during this

4    period?

5    A.   They were in the immediate area, canvassing the area for

6    the sunglasses and the bag that was reported.

7    Q.   And up to this point did you have any difficulty

8    understanding the defendant?

9    A.   Not at all.

10   Q.   Who was searching around in the area?

11   A.   Officer Marlin Rivera, Officer Dave Gamble, Officer Glenn

12   Marshall and I believe Officer Matt Price.

13           MR. FEINBERG:  I'm sorry.  The last one?

14           THE WITNESS:  I'm sorry.  Matt Price.  Officer Matt

15   Price.

16           MR. FEINBERG:  Oh, Price.

17           THE WITNESS:  Yup.

18   BY MR. GARLAND:

19   Q.   Now, when they were searching, do you recall them actually

20   searching the vehicle or just the area around the vehicle and

21   the mall?

22   A.   At the time just the mall area, sir.

23   Q.   At this point up to the point where you had given the

24   defendant his Miranda rights, did you or did you observe

25   anybody searching that vehicle that had been pointed out to you

1  by the reporting person?

2  A.   At the time I didn't observe anyone searching his motor

3  vehicle.

4  Q.   And up until that point had you been searching that

5  vehicle?

6  A.   No.

7  Q.   Where was most of your attention, by the way, up until

8  this point?  Was it on the surrounding area, on the defendant

9  or anywhere else?

10  A.   The defendant.

11  Q.   Did the officers who were searching around the area, were

12  they successful in finding anything, or did any new reports

13  come to them?

14  A.   No.

15  Q.   Did they learn anything else about the ATM at that time or

16  anybody else who had used the ATM?

17  A.   Yes.

18  Q.   What did they learn?

19       MR. FEINBERG:  I am just going to object to the

20  "they," your Honor.  I don't know who he is referring to.

21       THE COURT:  No.  I think it should be identified, to

22  the degree it can.

23  BY MR. GARLAND:

24  Q.   The officers who were searching around, did any of the

25  officers who were searching the area who I believe you listed

1    before find anything out about the area or the ATM?

2    A.    No.

3    Q.    Did they learn anything from any other people who had used

4    the ATM?

5    A.    Yes.

6    Q.    And which officer was that?

7    A.    Which officer learning anything about the ATM?

8    Q.    Yes.

9    A.    Myself, I believe -- I can't recall.  I'm sorry.

10   Q.    Do you recall what it was they had learned?

11   A.    Yes.  There was --

12         MR. FEINBERG:  I'm going to object.  Limited to

13   himself if he said he learned something.

14         THE COURT:  Well, either himself or the unidentified

15   other officer.

16         So, get some clarity on what the source of this

17   information is.

18   BY MR. GARLAND:

19   Q.    Officer Allen, is your memory exhausted on this point?

20   A.    Yes.

21   Q.    Would it assist you to review your reports?

22   A.    That would be helpful.

23   Q.    Please take a moment to do so.

24   A.    (Witness complied).

25   Q.    Is your memory refreshed from having looked at the

1    reports?

2    A.    Yes.

3    Q.    Could you answer the prior question, what officers learned

4    about the ATM from another person at the scene at that time?

5    A.    I'm sorry.  I didn't read the other officers, if they were

6    aware; I just kind of skimmed through the events.

7    Q.    Why don't you take another look, please.

8    A.    Sure.  Sorry.

9    Q.    Look through that and see if you can identify the

10   particular officers who had talked to somebody else.

11   A.    (Witness complied).

12   Q.    Is your memory refreshed on that point?

13   A.    Yes.

14   Q.    Which officers?

15   A.    Myself.

16   Q.    Who did you talk to, and what did you learn?

17   A.    I talked to an individual by the name Jane Reed.

18   Q.    And what did she tell you about the ATM?

19   A.    She stated that she attempted to make a transaction using

20   that particular ATM, and she was unable to retrieve her

21   personal card, her bank card, and unable to make a transaction

22   at the time.

23   Q.    You said at a particular ATM.  At which ATM?

24   A.    Eastern Bank.

25   Q.    Were there any other ATMs there that you were aware of?

1    A.    No.

2    Q.    Which ATM had the reporting person identified as having

3    seen Mr. Pascu or a suspicious person going in and out of?

4    A.    Eastern Bank.

5    Q.    What significance did you take from the report that that

6    ATM had eaten the client's card, the customer's card?

7    A.    I'm sorry.  Rephrase the question.

8    Q.    What significance did you attach to the fact that the ATM

9    had eaten that card?

10   A.    Well, knowing when there's a device put on the machine

11   that's what it does, it takes your card and it doesn't give it

12   back.

13         MR. FEINBERG:  I am going to object.  Motion to

14   strike.  There is no basis for his expertise.

15         THE COURT:  I will permit it.  That is his

16   understanding.  Whether or not it has grounds is another

17   matter.

18   BY MR. GARLAND:

19   Q.    What happened next after talking to Jane Reed?

20   A.    The responding officers deemed the ATM not to be used.

21   Q.    What does that mean?

22   A.    It means that we didn't allow the general public to use

23   the ATM at that time because it appeared to be defective at the

24   time.

25   Q.    What happened next?

1    A.    So, I got the individual's information and I documented

2    that, which would be Jane Reed.

3    Q.    And then?

4    A.    After that I believe myself and Officer Price asked verbal

5    permission to search Mr. Pascu's motor vehicle.

6    Q.    Who did you ask for that permission?

7    A.    I asked Mr. Pascu.

8    Q.    What language did you use?

9    A.    English.

10   Q.    Can you recall as best as you can for the Court what exact

11   words you used, to the best of your recollection?

12   A.    To my best recollection, we just asked if we can search

13   your motor vehicle, can we -- you know, basically, Can we have

14   permission to search your motor vehicle?

15   Q.    Did the defendant seem to have any difficulty

16   understanding you?

17   A.    No.

18   Q.    What did he respond?

19   A.    He responded, "Yes."

20   Q.    Can you recall, to the best of your recollection, what

21   words he used to indicate his response?

22   A.    English.

23   Q.    That was the language.  Can you recall the actual words?

24   Did he say, "Yes," did he use some other formulation?

25   A.    He said, "Yes."

1   Q.   Was he retrained at any point at this time?

2   A.   No.

3   Q.   Did you have any difficulty understanding him?

4   A.   No.

5   Q.   By the way, Officer Price.  What's Officer Price's first

6   name?

7   A.   Matthew.

8   Q.   Had he been standing with you this entire time, or had he

9   been anywhere else?

10  A.   Not the entire time.  During the time of verbal permission

11  to search the motor vehicle.

12  Q.   Before you asked for Mr. Pascu's consent to search the

13  motor vehicle, did you talk to Officer Price at all about the

14  situation?

15  A.   Yes.

16  Q.   And what did you let him know about what was going on?

17  A.   Myself and Officer Price had a dialogue of just the events

18  that were unfolding at the time.

19  Q.   Did he give you any advice as to how to proceed?

20  A.   Upon searching the vehicle, yes.

21  Q.   Before or after searching the vehicle?

22  A.   Pretty much like right before as we were walking over to

23  the motor vehicle.

24  Q.   Did you ask any advice of him before you actually asked

25  for consent?

1   A.   No.  Not that I remember, no.

2   Q.   So, you go over to the car, then, with Officer Price.

3   With anybody else?

4   A.   No.

5   Q.   When you went over to the vehicle were there any other

6   officers or detectives there?

7   A.   No.

8   Q.   Did you search the car?

9   A.   Yes.

10  Q.   Was the car open, or did you need to get keys from

11  anybody?

12  A.   Mr. Pascu voluntarily handed his keys over after we asked

13  for verbal permission.

14  Q.   So, before you walked over you had his keys; is that

15  correct?

16  A.   Yes.

17  Q.   When you got to the car was it locked or unlocked?

18  A.   I believe it was locked.

19  Q.   Did you use the keys to unlock it?

20  A.   Yes.

21  Q.   So, did you then search the car?

22  A.   Yes.

23  Q.   Where did you search and what did you find?

24  A.   At the time we searched the back seats and the front

25  seats.

1    Q.    What were you looking for?

2    A.    At the time we were looking for a bag described by the

3    reporting person and a pair of sunglasses.

4    Q.    Did you find the bag and sunglasses in the front seats and

5    the back seats?

6    A.    No.

7    Q.    At that time did you look anywhere else in the car?

8    A.    No.

9    Q.    Did you look in the trunk?

10   A.    I don't believe so.

11   Q.    And how long did you spend during the search?

12   A.    The initial search?  I want to say about a minute, two

13   minutes.

14   Q.    What did you do after that?

15   A.    We secured the vehicle and walked back over to Mr. Pascu.

16   Q.    And then what?

17   A.    I believe at that time Officer Price asked for the

18   detective to arrive on the scene.

19   Q.    How did he do that?

20   A.    Through radio communications.

21   Q.    So, you called back to the stationhouse and asked for

22   detectives?

23   A.    Correct.

24   Q.    And what did you do after he did that?

25   A.    I believe I just continued a dialogue with Mr. Pascu.

1   Q.   At any point did you talk to the reporting person again?

2   A.   Yes, I did.

3   Q.   And what did you ask?  What did you say to him, and what

4   did he say to you?

5   A.   I went back to the reporting person just to be sure that

6   this is the individual that he observed, you know, sporting the

7   bag and the sunglasses, just to be sure that this is the person

8   that he identified.

9   Q.   Was this because you hadn't found the bag and the

10  sunglasses up to this point?

11  A.   That's correct.

12  Q.   And what did Mr. Maffeo, the reporting person, say?

13  A.   He said he was sure that this is the individual that he

14  observed going in.

15  Q.   Did you go over the report with him again and establish

16  exactly what he had remembered seeing at this time?

17  A.   Yes.

18  Q.   And, again, was it consistent with what you reported

19  before, Mr. Pascu going in and out of the ATM, pulling his hood

20  over and putting on sunglasses when he entered the ATM, going

21  back to the car?

22  A.   Very consistent.

23  Q.   And taking off the hood and taking off the sunglasses

24  after he got out of the ATM?

25  A.   Yes.

```
1    Q.   Was there any doubt in Mr. Maffeo's mind about what had

2    happened and who had done it that you observed?

3              MR. FEINBERG:  I'm going to object.

4              THE COURT:  Sustained.

5              MR. FEINBERG:  Thank you.

6    BY MR. GARLAND:

7    Q.   Did the detectives arrive at any point?

8    A.   Yes.

9    Q.   About how long after Officer Price called them?

10   A.   Within minutes.

11   Q.   Which detectives?

12   A.   Detective Brian O'Connor, Detective Toby Flynn and

13   Detective David Atherton.

14   Q.   What did they do when they got there?

15   A.   They interviewed Mr. Pascu.

16   Q.   Were you there when they did that?

17   A.   I was present.

18   Q.   What language did they use?

19   A.   English.

20   Q.   Did the defendant appear to have any difficulty

21   understanding their English?

22   A.   It didn't appear so, no.

23   Q.   Did you hear his responses?

24   A.   I was quite off to the side, so I didn't hear the

25   responses, no.
```

1  Q.   What happened after the detectives came to there and

2  started interviewing the defendant?

3  A.   They contacted the bank.  I believe they went to speak to

4  a manager at the time regarding video footage.

5  Q.   And did you talk to the bank manager?

6  A.   No.

7  Q.   Were you aware did anybody speak to the bank manager?

8  A.   Yes.

9  Q.   Did anybody relate to you what had been said by the bank

10  manager?

11  A.   No.

12  Q.   What was your next involvement with the investigation?

13  A.   Just had brief conversations with Mr. Pascu.

14  Q.   Did you talk to Mr. Pascu again at all about his vehicle?

15  A.   I can't recall.  We had dialogue through the whole time

16  that we were on the scene.

17  Q.   So, at this point you can't recall whether you talked to

18  him about his vehicle again?

19  A.   We did ask for verbal permission again to search his

20  vehicle.

21  Q.   So, this is the second time?

22  A.   I'm sorry.  Yes.

23  Q.   And who was it that did this?

24  A.   Myself and Officer Price.

25  Q.   At this point was the defendant being restrained at all?

1   A.   No.

2   Q.   Was he in cuffs?

3   A.   No.

4   Q.   Was he in the back of a police vehicle?

5   A.   No.

6   Q.   Did any detectives or the officers have hands on him?

7   A.   No.

8   Q.   As best as you can recall, how did you ask him for consent

9   to search the vehicle again?

10   A.   In English.

11   Q.   And what did he respond, if anything?

12   A.   He said, "Yes."

13   Q.   Did you go over and search the vehicle again?

14   A.   Yes.

15   Q.   Who performed that search?

16   A.   Myself and Officer Price.

17   Q.   Did you use the keys again?  Did you still have the keys?

18   A.   Yes.

19   Q.   That was really two questions.  Did you have the keys

20   then?

21   A.   Yes.

22   Q.   How long did you search the vehicle for after that?

23   A.   Minutes.

24   Q.   What areas of the vehicle did you search?

25   A.   Again, the back seat, the front seats, the center console.

1  Q.   Did you find anything during that search?

2  A.   Yes.

3  Q.   What did you find?

4  A.   I found three pieces of paper with addresses listed on

5  them and a passport not belonging to Mr. Pascu.

6  Q.   What type of passport was it, what nationality?

7  A.   I believe it was a Romanian passport.

8  Q.   Do you recall in what name the passport was in?

9  A.   If I can pronounce it right, I'm sorry, I believe it was

10  Ionut Moiceanu.  I'm sorry.

11  Q.   Did that passport have a picture of the defendant or of

12  somebody else?

13  A.   Somebody else.

14  Q.   The addresses.  How many addresses were on the paper?

15  A.   There were three pieces of paper with a number of

16  addresses.  I never took a count.

17  Q.   What did you do with the passport and with the addresses?

18  A.   After we retrieved them from the motor vehicle we passed

19  it off to the detectives that were on scene.

20  Q.   During the time that you were talking to the defendant,

21  was he standing, was he sitting?

22  A.   At times he kneeled down, but most of the time he was

23  standing.

24  Q.   And you said that you spent at least two hours with him.

25  Did you offer him any food or water?

1    A.   I did.

2    Q.   What did you offer him?

3    A.   I offered if he needed some water.

4    Q.   What did he say?

5    A.   He said, "No."

6    Q.   At some point did the Secret Service come?

7    A.   Yes.

8    Q.   Which agent was that?

9    A.   Agent Brett Seidel.

10   Q.   And were you present for the actions that he took at the

11   location?

12   A.   Yes.  I was on-scene still.

13   Q.   What did he do?

14   A.   He attempted to see if the device was a skimmer on the

15   ATM.

16   Q.   So, he inspected the ATM?

17   A.   Yes, he did.

18   Q.   And what did he do then?

19   A.   Around that time he pried off the device that was attached

20   to the ATM.

21   Q.   So, you determined that there was a device there; is that

22   correct?

23   A.   That is correct.

24   Q.   How did he do that, did you see?

25   A.   I did not.

1    Q.    Now, ATMs often have video surveillance photos.  Are you

2    aware of whether anybody looked through any surveillance photos

3    or whether there was any ATM surveillance photos from that ATM?

4    A.    I believe there was cameras inside the ATM.  At the time I

5    wasn't around the detectives; I was actually doing the

6    investigation.

7    Q.    So, it would have been the detectives who would have

8    looked through ATM photos, surveillance photos?

9    A.    Yes.

10   Q.    After the skimmer comes off what happens?

11   A.    Around that time dialogue and conversation went on between

12   the Secret Service and the detectives.

13   Q.    And then what?

14   A.    And eventually Mr. Pascu was placed in handcuffs.

15   Q.    Was he arrested at that point?

16   A.    Yes.

17   Q.    Was he Mirandized at that point?

18   A.    I can't recall.

19   Q.    Had he previously been Mirandized, however?

20   A.    Yes.

21   Q.    And then what happened to Mr. Pascu at that point?

22   A.    At that point he was placed in back of a Cambridge Police

23   wagon and transported to 125 Sixth Street.

24   Q.    Did you go with him during that transport?

25   A.    No.

1    Q.   I want to ask you about the reports that you have in front

2    of you.  Is there any reason why you have generated multiple

3    reports following this investigation and the events?

4    A.   Yes.

5    Q.   Why?

6    A.   My initial report wasn't, I guess, specific and detailed

7    and clear as far as the elements of the crime.

8    Q.   Did your superiors then ask you to revise it with more

9    detail?

10   A.   Yes.

11        MR. GARLAND:  Your Honor, may I take a moment to

12   confer with co-counsel?

13        THE COURT:  Yes.

14            (Counsel conferred off the record)

15        MR. GARLAND:  No further questions at this time, your

16   Honor.

17        THE COURT:  All right.  Mr. Feinberg.

18                       CROSS-EXAMINATION

19   BY MR. FEINBERG:

20   Q.   Good morning, Officer.

21   A.   Good morning, sir.

22   Q.   Let me just start by showing you a couple of pictures and

23   asking you to identify if this is generally the area that we

24   are talking about.

25   A.   Okay.

1   Q.   Generally speaking, is this the front part of the mall?

2   A.   Yes.

3   Q.   And just to give a couple of different views of it -- and

4   I will mark these, Judge, after I show them -- there is the

5   Eastern Bank, next to it is the Radio Shack, McDonald's, this

6   is several other shops to the right, a Staples is to the left.

7   Is that correct?

8   A.   Yes.

9   Q.   That's a fair and reasonable and accurate view of the mall

10  as it was that day?

11  A.   Yes.

12  Q.   And here is a view of the parking lot facing the mall.

13  Does that give you a sense of how large the parking lot is?

14  A.   Yes.   Just, the previous slide, I believe there was

15  Blockbuster store right beside McDonald's at the time.

16  Q.   Same thing with this photograph.   It shows the walkway.

17  Do you see where it says "Radio Shack," and that's the walkway,

18  and then between the walkway and the parking lot is a two-lane

19  road?

20  A.   Yes.

21  Q.   And then there is a very large parking area; am I correct?

22  A.   That's correct.

23         MR. FEINBERG:   I would mark these as Defendant's 1

24  through 4, or 1A through B or whatever.

25         THE COURT:   We will mark them as Exhibits 1A through D

1    in the order in which they were shown to the witness.

2       (Defendant's Exhibit Nos. 1A thru D received into evidence)

3    BY MR. FEINBERG:

4    Q.   Now, Officer Allen, you actually produced or created four

5    different reports, am I correct?

6    A.   I'm not too sure.  I know I --

7    Q.   Well, you wrote a report that night, am I right?

8    A.   That's correct.

9    Q.   And you have that in front of you?

10   A.   Yes.

11   Q.   And it says at the upper left the incident number, and I

12   won't give the whole number, but it ends in 3054 slash 1.

13   A.   Can I look at it?

14   Q.   Sure, take a look.  I'm sorry.  Go ahead.

15                          (Pause)

16   A.   I'm sorry.  Repeat that number again.

17   Q.   You see it says at the top of the page:  Cambridge Police

18   Department, Cambridge Massachusetts --

19   A.   Mm-hmm.

20   Q.   And right underneath that it says Incident Number?

21   A.   Yes.

22   Q.   And then it says slash 1.

23            MR. FEINBERG:  May I approach, Judge?

24            THE COURT:  Yes.

25   BY MR. FEINBERG:

```
 1    Q.    I'm asking you to look at number 1.
 2              MR. FEINBERG:  May I have a moment, your Honor?
 3              THE COURT:  Yes.
 4              MR. FEINBERG:  Do you have number 1?
 5    BY MR. FEINBERG:
 6    Q.    This is Report No. 1.  Do you see where it says the
 7    incident number and then after the incident number there's a
 8    slash and it says number 1?
 9    A.    Yes.
10    Q.    And does that refer to your Report No. 1 or to the first
11    report that was done as a result of this investigation?
12    A.    That's my initial report.
13    Q.    And so, you have that report, am I correct?  You wrote
14    that report.  And does it say when it was first created?
15    A.    It does.  There is a date and a time.
16    Q.    I'm sorry?
17    A.    Yes.
18    Q.    When was it created?
19    A.    Created 5/31/2011.
20    Q.    5/31?
21    A.    I'm sorry.  5/1/2011.  Sorry.
22    Q.    And what time?
23    A.    Completed at 11:52 and 36 seconds.
24    Q.    How do you know that that was when it was completed?  Do
25    you see there is another date up above it where it says when
```

1    it's printed?

2    A.    Yes, I do.

3    Q.    Well, when did you write that report?

4    A.    This report says printed -- time and date printed Sunday,

5    May 1st, 12:52.

6    Q.    And then you wrote two other reports, am I correct?

7    A.    I believe I wrote one other report, and then the other one

8    was a supplemental, an arrest report, which is from the same

9    report.

10   Q.    Well, you actually started to write another report and

11   then you stopped in the middle, am I right?

12   A.    Not that I remember of.

13   Q.    Do you have Report No. 3 in front of you?

14   A.    Yes, sir.

15   Q.    Will you turn to the second page?  How long is Report No.

16   3?

17   A.    That's an arrest report, sir.

18   Q.    I'm sorry?

19   A.    That's an arrest report.

20   Q.    Okay.  So, it's just a very short report?

21   A.    That's taken from the initial --

22   Q.    It's taken from the first one?

23   A.    That's correct.

24         MR. GARLAND:  Your Honor, may the witness be allowed

25   to finish his answers?

1          THE COURT:  Yes.  There is not a problem yet, but --

2          MR. GARLAND:  Thank you.

3   BY MR. FEINBERG:

4   Q.   Is fair to say that your first report is the one that says

5   No. 1, correct?

6   A.   Correct.

7   Q.   The one that says No. 3 is just what you call an "arrest

8   report," which is just a one-paragraph kind of summary, am I

9   correct?

10  A.   That's correct.

11  Q.   And then you wrote another report, No. 5, isn't that

12  correct, the big long one?

13  A.   That's correct.

14  Q.   And the No. 5 report was created four days later, am I

15  correct?

16  A.   On the 4th of May.

17  Q.   Three days later.  Sorry.  And it was created -- well, in

18  any event, it was created several days after the first report,

19  am I right?

20  A.   That's what it states, correct.

21  Q.   And your first report was the one that was closest in time

22  to the event, am I correct?

23  A.   Correct.

24  Q.   And the second report, the No. 5 report, was four days

25  later, four days after the event.

1   A.   It was on the 4th of May.

2   Q.   And during those four days you had conversations with

3   other police officers, did you not, about this incident?

4   A.   I can't recall.  I might have.  I can't recall.

5   Q.   Does it refresh your memory if I told you that Officer

6   Marshall had a discussion with you and assisted you in making

7   the second report?

8   A.   He gave me advice.

9   Q.   He gave you advice during those four days, am I correct?

10  A.   I'm not sure if it was within those four days, but he did

11  give me advice around that time.

12  Q.   Do you recall any other police officers giving you advice

13  as to what to put into that second report?

14  A.   I can't recall.

15  Q.   Would it be fair to say, whether you recall the actual

16  officers or not, you did have other conversations with police

17  officers about what had happened?

18  A.   I'm not sure if it was within those couple of days or not.

19  I can't remember.

20  Q.   Well, in any case, during that period of time didn't you

21  have conversations with other police officers about the issue

22  of consent?

23  A.   I probably did.

24  Q.   And in those conversations with other police officers

25  there was discussion about the concern that the defendant was a

1   foreigner and whether or not he understood the language that

2   you were speaking to him, am I correct?

3   A.   Concern?  I'm sorry.

4   Q.   Yes.

5   A.   Not that I recall.

6   Q.   Were you aware of the fact that Officer DeSimone was

7   called in to interview the defendant on the night of the arrest

8   because he spoke Italian?

9   A.   No, I was not aware of that.

10  Q.   You were not made aware of that at any time?

11        THE COURT:  Just so the record is clear, you have to

12  answer verbally.

13        THE WITNESS:  I'm sorry.  No, I was not aware.

14  BY MR. FEINBERG:

15  Q.   I am focusing you now on the first report, the earliest in

16  time, which would be the one that says slash number 1, and it's

17  dated May 1st at 11:52.  Do you see that one?

18  A.   I do.

19  Q.   In that report the conversation that you say you had with

20  the defendant doesn't include any detail about the car in the

21  conversation with the defendant, does it?

22  A.   Am I able to refer back to my report?

23  Q.   Yeah, sure.  Go ahead, look at it.  In fact, why don't you

24  look at page 2, the top of page 2.  Do you see you asked

25  Mr. Pascu if you could talk to him, correct?  Do you see at the

1    very top of page 2?

2    A.    I'm on page 2.

3    Q.    The very top:  "I stopped and exited my cruiser."  Do you

4    see that?

5    A.    It's page 3.

6    Q.    I'm sorry?

7    A.    Page 3.

8    Q.    I'm sorry.  You're right.  Page 3.

9          "I stopped and exited my cruiser."  Do you see that?

10   A.    I do, sir.

11   Q.    "And I asked the unknown individual if I could speak to

12   him, where Pascu agreed."  Do you see that?

13   A.    Yes.

14   Q.    And then you asked him what he was doing in the area, am I

15   correct?

16   A.    Yes.

17   Q.    And "He said he was waiting for his friend Roberta."

18   A.    That's correct.

19   Q.    And that's in quotes, isn't it?

20   A.    It is.

21   Q.    Did he actually say the words, I am waiting for my friend,

22   Roberta?

23   A.    I believe so, yes.

24   Q.    You believe he did?

25   A.    Yes.

1   Q.   And then you asked him whether or not he entered the bank,

2   am I correct?

3   A.   Yes.

4   Q.   And you pointed to the bank.  You used a gesture to point

5   to the bank, correct?

6   A.   Yes.

7   Q.   And he said, "Yes."  Didn't he say, "Yes"?

8   A.   Yes.

9   Q.   But that he didn't get any money.

10  A.   That's correct.

11  Q.   And then you asked him for his identification.

12  A.   Yes.

13  Q.   And he gave you a passport and another form of

14  identification; is that correct?

15  A.   Yes.

16  Q.   Now, you didn't say anything in this first report about

17  any other conversation you had with Mr. Pascu, did you?

18  A.   It doesn't appear to be.

19  Q.   No additional dialogue that you had with Mr. Pascu is

20  indicated here, am I correct?

21  A.   Not in this report, no.

22  Q.   And, in addition to that, there is nothing in here about

23  other police officers arriving, is there?

24  A.   It appears just to be Officer Price.

25  Q.   Just Officer Price; is that correct?

1    A.    Correct.

2    Q.    In this first report on page 2 in the first paragraph, you

3    say, "After speaking with the suspicious person in question and

4    gathering valuable information, I read the unknown individual

5    his Miranda rights."

6              Do you see that sentence?

7    A.    I don't, but I'll locate it.

8    Q.    I'm sorry?

9    A.    Not at this time, but I'll locate it.

10   Q.    It's in the first paragraph about two-thirds of the way

11   in.

12   A.    Yes.

13   Q.    Did you write anything in there about a pat frisk?

14   A.    No.

15   Q.    Did you write anything in this report about a pat frisk?

16   A.    No.

17   Q.    Now, let's go back to page 3 of this report.  After you

18   asked him for his identification, you wrote, "At this time

19   other responding units arrived at my location to assist me."

20              Do you see that?

21   A.    You said on page 3?

22   Q.    Yes.

23                         (Pause)

24   Q.    It's the third paragraph down.  The paragraph starts, "I

25   then asked Pascu."  Do you see that?

1  A.   That's the paragraph where I asked if he entered the bank.

2  Q.   After that, next paragraph.

3  A.   Okay.

4  Q.   Second sentence.  "At this time other responding units

5  arrived at my --"

6  A.   Yes, yes.

7  Q.   And then after that it says, "Pascu admitted being the

8  operator of the car," if you look at that, what you wrote.  Do

9  you see that?

10  A.   Yes.

11  Q.   And then "Myself and Officer Price," quote, verbal -- I'm

12  sorry.  I will read it to you.  "Pascu admitted being the

13  operator of a gray" -- I won't go through the numbers -- "a

14  gray Chrysler and gave myself and Officer Price verbal

15  permission to inventory New York registration number he was in

16  possession and control of."

17       Do you see that?

18  A.   That's correct.

19  Q.   When you talked to Mr. Pascu, did you say to him, I would

20  like your permission to inventory the vehicle?

21  A.   Not in those exact words.

22  Q.   Did you use the word "inventory" at all?

23  A.   Not that I can remember of.

24  Q.   So, you didn't say what you said in the piece of paper

25  here, did you?

1   A.   No.

2   Q.   In fact, you used the word "inventory" here to avoid the

3   idea of an actual search, didn't you?  An inventory is

4   different from a search, isn't it?

5   A.   Not that I know of.

6   Q.   There is no difference between an inventory and a search;

7   is that correct?

8   A.   Not that I know, sir.  I mean, I use the word "inventory"

9   the same way I would use as a "search."

10   Q.   You didn't use that in the next report, did you?  You

11   didn't use the word "inventory" in the next report, did you?

12   A.   I don't think so.  I don't believe so.

13   Q.   You used the word "search," didn't you?

14   A.   Yes.

15   Q.   And in the next report -- well, for that matter, in

16   neither report did you say anything about keys, did you?

17   A.   I don't think so.

18   Q.   You didn't say what you testified to today, that the

19   defendant gave you the keys.

20   A.   I don't believe I documented that, no.

21   Q.   You didn't document that at all.  You didn't think that

22   was important?

23   A.   I just didn't document it.

24   Q.   And there was no reference in either report about the

25   length of the search in the first report, is there?

1    A.    I didn't document that either.

2    Q.    And you didn't document a second request to search in the

3    first report, did you?  In the first report there is no mention

4    of a second request made of the defendant to search his

5    vehicle, is there?

6    A.    I didn't document that.

7    Q.    And instead of listing the stuff that you found in the

8    car, you just said in the first report, "I discovered several

9    items of interest."  Am I correct?

10   A.    That's correct.

11   Q.    Now, fair to say that the second report created several

12   days later, or at least three days later, was much more

13   extensive than the first report?  Am I correct?

14   A.    That's correct.

15   Q.    Now, Officer, when you arrived -- and you say you arrived

16   around 2:00, am I correct?

17   A.    I believe that's the time it was.

18   Q.    And you cruised the area, correct?

19   A.    You mean --

20   Q.    Well, you were in your car.

21   A.    That's correct.

22   Q.    And you saw this man walking on the sidewalk that we just

23   showed, am I correct?

24   A.    The individual described, given out by Communications,

25   correct.

1  Q.   And you didn't stop him.  When you first saw him, you

2  didn't stop him.

3  A.   No.

4  Q.   And at some point you had a conversation with the citizen

5  Mr. Maffeo?

6  A.   The reporting person, correct.

7  Q.   And he came over to your cruiser?

8  A.   No.

9  Q.   You got out of your cruiser?  Where did you talk to

10  Mr. Maffeo?

11  A.   He flagged me down.

12  Q.   Okay.  And were you inside your cruiser, or did you get

13  out?

14  A.   I remained inside my cruiser.

15  Q.   So, you had a conversation with him, am I correct?

16  A.   With the reporting person, yes.

17  Q.   And how long was that conversation?

18  A.   Thirty seconds to a minute, maybe.

19  Q.   And then you drove away, correct?

20  A.   Correct.

21  Q.   And you located the man again?

22  A.   The individual described, correct.

23  Q.   It was the same man you had seen in the first place?

24  A.   Yes.

25  Q.   And he's walking -- if I could have the photograph.  Thank

1    you.

2          He's walking on this sidewalk underneath the signs, am

3    I correct?

4    A.   Yes.

5    Q.   And he's walking away from or toward the Eastern Bank?

6    A.   When I initially spotted him?

7    Q.   No.  After you spoke to the concerned citizen, you are now

8    looking for him again, correct?

9    A.   Correct.

10   Q.   And your cruiser is where, near the Olympia store?

11   A.   At which time, sir?

12   Q.   When you were looking for him.

13   A.   Right.  Well, the reporting person was across from the

14   bank on the other side of the parking lot.

15   Q.   All the way at the other end?

16   A.   Yes.

17   Q.   So, you cruised around the area?

18   A.   I proceeded to make my way back over to where I had last

19   seen the individual described.

20   Q.   And in what direction was your cruiser driving when you

21   saw him again?

22   A.   The second time my cruiser was facing away from Eastern

23   Bank towards the McDonald's.

24   Q.   And he's walking towards the Eastern Bank, am I correct?

25   A.   He's walking back towards that direction, correct.

1    Q.    And he's on a cell phone?

2    A.    At the time, yes.

3    Q.    And is your window open or closed?

4    A.    I can't recall.

5    Q.    Well, could you hear him on the cell phone?

6    A.    No.

7    Q.    And while he's walking did you pull the cruiser over and

8    get out of the car?

9    A.    Yes.

10   Q.    And that was somewhere around where, the McDonald's?

11   A.    Olympia Sports store.

12   Q.    Near the Olympia Sports, okay.  And then you had a

13   conversation with him?

14   A.    We had a dialogue, correct.

15   Q.    And how long do you tell us today that that conversation

16   took place?  How long did you talk to him?

17   A.    The entire time I was with him?

18   Q.    That initial conversation.

19   A.    The initial conversation I can't recall.  Minutes.  I

20   can't recall.

21   Q.    Five minutes?

22   A.    I can't recall, sir.

23   Q.    Let me put it a different way.  How long were you with him

24   alone before other police officers arrived?

25   A.    Approximately a minute or so.  I can't recall.

1    Q.    A minute?

2    A.    A minute or so, correct.  I can't recall.

3    Q.    So, you are telling us that at least a good deal of that

4    conversation was heard by other police officers?

5    A.    At what point in time?

6    Q.    Well, let me put it a different way.  Your conversation

7    was longer than a minute, wasn't it?

8    A.    The entire time I was there or the initial conversation

9    when I was by myself?

10   Q.    The initial conversation with Mr. Pascu was more than a

11   minute, am I correct?

12   A.    Around that time.  I can't recall.

13   Q.    You can't recall what?

14   A.    The conversation -- the period of time I had a

15   conversation with Mr. Pascu.

16   Q.    You are telling us that this conversation that you had in

17   your second report that goes on for a full page took less than

18   a minute?

19   A.    I can't recall.

20   Q.    You had a conversation with him about why he was in the

21   area, am I correct?

22   A.    I remember the conversation.

23   Q.    And he was waiting for Roberta, correct?

24   A.    I remember that.

25   Q.    You were alone during that conversation?

1   A.   I believe so.

2   Q.   And was he by himself, and he said, "Yes"?

3   A.   That's correct.

4   Q.   Did he come from the Cambridge area, and he said "No," and

5   where did he come from, he said "New York."  All of that was

6   while you were alone with him, correct?

7   A.   I believe so.

8   Q.   And you asked him about a car and where it was located?

9   A.   Yes.

10  Q.   And you asked him where it was parked, and he told you

11  that he didn't remember --

12  A.   Correct.

13  Q.   -- but that it was somewhere in the parking lot?

14  A.   Correct.

15  Q.   In all of this you are alone with him?

16  A.   Correct.

17  Q.   Then you had asked him for identification, and you got the

18  identification from him?

19  A.   Yes.

20  Q.   And at that point you were still alone with him?

21  A.   I believe so.

22  Q.   Well, yes or no?

23  A.   I would have to refer back to my report, but I believe so.

24  Q.   And was it at that point that the other police officers

25  came on the scene?

1    A.    Correct.

2    Q.    And you're saying that that whole thing took about a

3    minute, a couple of minutes?

4    A.    I can't recall.  It was minutes.  I mean, I can't recall.

5    We had a dialogue.

6    Q.    You said that that conversation was implausible, am I

7    correct?  Is that the word you used?

8    A.    As we continued our dialogue.

9    Q.    No, no.  At that point in time were his answers

10   implausible?

11   A.    At that time, when I was alone with Mr. Pascu?

12   Q.    Yes, yes.

13   A.    They were sort of evasive.

14   Q.    Why were they evasive?

15   A.    Because of the answers that he was stating.

16   Q.    What answer was evasive?

17   A.    Well, the fact that he drove a motor vehicle but he

18   couldn't remember where he parked it.

19   Q.    Well, it was a big, crowded parking lot, wasn't it?

20   A.    The parking lot was full.

21   Q.    The parking lot was full.  Other than that was there

22   anything else that you thought was evasive?

23   A.    Just -- I can't remember the exact dialogue.  I would have

24   to refer back to my report.

25   Q.    Well, refer to your report up until the point in time when

1   other officers arrived.  That would be on page 2 and 3 of

2   Report No. 5.

3   A.   (Witness complied).

4   Q.   Have you referred to it?

5   A.   Yes, I have.

6   Q.   Anything evasive about the answers, the questions and the

7   answers that he gave on the bottom of page 2 and the top of

8   page 3?

9   A.   Just to me.

10   Q.   The ones to you.

11   A.   Yeah, to me.  Just the fact that he stated that he parked

12   a motor vehicle and he couldn't remember where he parked it.

13   Q.   I know.  I'm asking you if there's anything else that you

14   thought was evasive or implausible about it.  You used the word

15   "implausible," didn't you?

16   A.   I did.

17   Q.   That word you used, "implausible," it didn't relate to the

18   answers he gave you when you were alone with him, did it?

19   A.   I believe I stated that later on in the report after we

20   had further dialogue.

21   Q.   Sir, I'm only asking you a question that calls for a yes

22   or no answer, and that is whether or not the implausible

23   answers that you referred to earlier were in the conversation

24   that you had alone with the defendant.

25   A.   Did I apply that word to the conversation I had?

1    Q.    Yes.

2    A.    No.

3    Q.    Thank you.  Now, during the conversation that you had with

4    him alone, did you use gestures at any time?  Did you point to

5    the Eastern Bank?

6    A.    Yes.

7    Q.    And did he have an accent?

8    A.    He did.

9    Q.    Thick accent?

10   A.    Pretty much.

11   Q.    And he nodded his head a lot, did he?

12   A.    He used gestures also.

13   Q.    And, in fact, did he always say the word "Yes," or did he

14   sometimes nod his head to questions that you gave him?

15   A.    We had a dialogue besides the word "Yes."

16   Q.    He always used the word "Yes"?

17   A.    No.

18   Q.    So, he didn't always use the word "Yes;" is that correct?

19   A.    That's correct.

20   Q.    Sometimes he nodded his head?

21   A.    Sometimes he nodded his head followed by the word "Yes."

22   Q.    And sometimes he didn't?

23   A.    Not that I can remember of.

24   Q.    So, he always used the word "Yes"?

25   A.    He didn't always use the word "Yes."  We had a dialogue.

1  Q.   I know.  You keep saying, "We had a dialogue."  I'm trying

2  to get a sense of what that dialogue was.

3  A.   Okay.

4  Q.   So, what I'm asking you is whether or not there were times

5  when he nodded his head without speaking?

6  A.   No.  It was always followed by a verbal response.

7  Q.   And did he speak in complete sentences?

8  A.   Sentences that I could understand.

9  Q.   Other than saying, I'm waiting for my friend Roberta, did

10  he use a sentence at all?

11  A.   Just when he answered that question?

12  Q.   No.  Other than answering that question did he ever speak

13  in a full sentence while you were talking to him alone?

14  A.   Yes.

15  Q.   What sentence did he use?

16  A.   The entire time that we had a dialogue?

17  Q.   No.  The time that you were with him alone when you had a

18  dialogue.

19  A.   I would have to refer back to my report.

20  Q.   Go right ahead.  Page 2 and 3 of Report No. 1 -- I'm

21  sorry -- Report No. 5.

22  A.   Where he stated that he couldn't remember where he parked

23  the motor vehicle but it was somewhere in the parking lot.

24  Q.   He used those words?

25  A.   Yes.

1    Q.   He used the words I drove the motor vehicle but I can't

2    remember where it's located?

3    A.   He didn't --

4    Q.   He said those words to you in English?

5    A.   No.

6    Q.   No?

7    A.   No.

8    Q.   What did he say to you?

9    A.   I can't remember the exact wording, but he did state that

10   he drove to that area and he couldn't remember where he parked

11   his car.

12   Q.   I'm asking you how he communicated that.

13   A.   In English.

14   Q.   What did he say?  What words did he use?

15   A.   I don't remember the exact wording.

16   Q.   Now, police officers arrive, am I correct?

17   A.   At some point.

18   Q.   And that would be Gamble, Marshall, Rivera and Price?

19   A.   Correct.

20   Q.   About how long after the beginning of your confrontation

21   with the defendant did the police officers arrive?

22            MR. GARLAND:  Objection.

23   A.   Confrontation?

24            MR. GARLAND:  Objection to the word "confrontation."

25            MR. FEINBERG:  I'll strike it.  Whatever.

1        THE COURT:  Well, I understand what he means.

2   BY MR. FEINBERG:

3   Q.   About how long after you first got out of your cruiser to

4   talk to the defendant did the other police officers arrive?

5   A.   I can't recall.  Minutes, maybe.  I can't recall.

6   Q.   Well, can you give us your best judgment?

7   A.   I can't recall.  Minutes.

8   Q.   Five minutes?

9   A.   Within minutes.  I can't recall.

10  Q.   And did you direct them what to do at that point?

11  A.   No.

12  Q.   Did anybody direct them what to do at that point?

13  A.   Not that I can recall.

14  Q.   Were they just standing there with you?

15  A.   We had a dialogue of the events and the dialogue I had

16  with Mr. Pascu.

17  Q.   So, how many cruisers had arrived?

18  A.   Three.

19  Q.   And were the three cruisers lined up in the open roadway

20  there adjacent to the walkway?

21  A.   I'm not sure exactly where each officer parked their

22  cruiser, but they were visible in that area.

23  Q.   Okay.  Did they have their lights on?

24  A.   No.

25  Q.   And there are at least five of you standing adjacent to

1    the defendant somewhere along that walkway, am I correct?

2    A.    That is correct.

3    Q.    And are all five of you in uniform?

4    A.    In full uniform, correct.

5    Q.    And at any point did you become aware of two narcotics

6    officers who had arrived?

7    A.    I didn't, no.

8    Q.    At no point?

9    A.    I didn't, no.

10   Q.    And the five of you are standing there with Mr. Pascu, am

11   I correct?

12   A.    Correct.

13   Q.    And you tell them what's going on?

14   A.    I relayed the dialogue that me and Pascu had, yes.

15   Q.    And did somebody tell you you had better give him his

16   Miranda warnings now?

17   A.    Officer Glenn Marshall.

18   Q.    Officer Marshall told you you had better give him his

19   Miranda warnings?

20   A.    Not in those exact words, no.

21   Q.    Well, what were his words?

22   A.    I can't recall.

23   Q.    Well, whatever the words were, he communicated to you in

24   some way that this was the time to give him his Miranda

25   warnings, am I correct?

1    A.    In some way.

2    Q.    And you did?

3    A.    Yes.

4    Q.    Am I correct?

5    A.    Yes.

6    Q.    At about this time?

7    A.    Yes, exactly.

8    Q.    And at this time you also patted him down?

9    A.    I believe so.

10   Q.    So, when you were patting him down for your safety and the

11   safety of the other officers, there were five officers standing

12   there, am I correct?

13   A.    In the area.

14   Q.    In the area or watching you pat him down?

15   A.    They were present.

16   Q.    They were all present?  And you patted him down and a hat

17   fell out?

18   A.    That's correct.

19   Q.    You patted him down and you didn't feel any sunglasses?

20   A.    No.

21   Q.    You patted him down and you didn't find the cell phone?

22   A.    He had the cell phone in his hand.

23   Q.    Did you ask him for the cell phone?

24   A.    I asked him to put it away, correct.

25   Q.    And he put it in his pocket?

1    A.    Yes.

2    Q.    And did he put it in his pocket before or after you patted

3    him down?

4    A.    Before.

5    Q.    And then you could feel the cell phone when you were

6    patting him down; is that correct?

7    A.    If I can remember, yeah, correct.

8    Q.    And could you feel his keys?

9    A.    Yes.

10   Q.    You felt his keys but you didn't take them?

11   A.    Not at that time.

12   Q.    And you didn't even pull them out to see whether or not

13   they were keys?

14   A.    Yes, we did.

15   Q.    You did take them out?

16   A.    Yes.

17   Q.    And what did you do with the keys when you took them out?

18   Did you show them to the other officers?

19   A.    I can't remember.  We did have him remove everything from

20   his pockets for our safety.

21   Q.    You did remove them.  Where did you put them?

22   A.    On the back of the trunk of the police cruiser.

23   Q.    What was on the back of the trunk of the police cruiser?

24   You said there were the keys, the car keys, correct?

25   A.    That's correct.

1    Q.    Was the cell phone there, too?

2    A.    Correct.

3    Q.    And the cap that fell out, you put that on the back of the

4    cruiser?

5    A.    On top of the hood, correct.

6    Q.    And did you also take out the -- he gave you the passport,

7    or did you get the passport from the frisk?

8    A.    Before that time he had handed me some identification.

9    Q.    Did you put the identification also on the hood of the

10   car?

11   A.    Yes.

12   Q.    And did you also put the second identification on the hood

13   of the car?

14   A.    I believe so.  We put all his items together.  I believe

15   so.

16   Q.    And was there anything else that you removed from his

17   person that you put on the hood of the car?

18   A.    Not that I can recall at this time.

19   Q.    Now, it's at that point, I gather, that you continue to

20   ask him more questions; is that correct?

21   A.    Correct.

22   Q.    And that's questions about Roberta and what her cell phone

23   number is and so on?

24   A.    That is correct.

25   Q.    The police officers are all just still standing there?

1 A. I believe around that time -- I really can't recall, but

2 around that time other officers began a search for a bag and

3 sunglasses.

4 Q. Was there somebody in charge at this point?

5 A. No.

6 Q. Did somebody say to you, I'm going to go look for the bag

7 and the glasses?

8 A. There was just a joint consensus of just a search --

9 Q. Well, did somebody say something, I'm going to look for

10 the bag and the glasses?

11 A. I can't remember.

12 Q. Do you know who went to look for the bag and the glasses?

13 A. I believe, because I stayed with Mr. Pascu, it was the

14 other officers that arrived.

15 Q. All of them?

16 A. I believe so.

17 Q. Officer Price didn't stay with you?

18 A. I believe he joined in on the search for a short period of

19 time.

20 Q. Did you see where they went?

21 A. My attention was focused on Mr. Pascu.

22 Q. And did you see whether or not any of them took the keys

23 or anything else that was on the hood of the car with them when

24 they left your presence?

25 A. I did.

1    Q.   What did you see?

2    A.   The items were still on the trunk of the car.

3    Q.   The what?

4    A.   His items still remained on the trunk of the car.

5    Q.   Including the keys?

6    A.   Including the keys.

7    Q.   So, as far as you knew, nobody went to the car at that

8    point?

9    A.   As far as I knew.

10   Q.   And nobody got into the car at that point?

11   A.   As far as I knew.

12   Q.   Well, why do you keep saying as far as you knew?  Is there

13   something that you know now that you didn't know then?

14   A.   No.

15   Q.   So, you did not see anybody go near the car.  You didn't

16   even know where the car was, did you?

17   A.   No.  Well, actually, I did know where the car was.  I did.

18   Q.   How did you know where the car was?

19   A.   Because the reporting person pointed it out to me.

20   Q.   You could see it?

21   A.   From where I was standing or when I was talking to the

22   reporting person?

23   Q.   No, no, no.  I'm sorry.  Let me rephrase that.  When you

24   were with Mr. Pascu could you see the car that the reporting

25   person had pointed out?

1    A.   Not from where I was standing.  It was camouflaged with

2    all the other cars.  I couldn't see it.

3    Q.   You only knew its general location, because when you

4    talked at a different location with the reporting person he

5    pointed it out to you?

6    A.   That's correct.

7    Q.   And roughly, and I am going to be rough about this,

8    obviously -- I'm showing you my little drawing here of an

9    overview.  Do you see there is -- I have only got enough room

10   for the Modells, but if you keep going down, you will see

11   Eastern Bank.  Do you see Eastern Bank?

12   A.   Yes.

13   Q.   And you are in the approximate area of Olympia Sports, is

14   that correct, when you are stopping and talking to the

15   defendant?

16   A.   Yes.

17   Q.   Roughly on this chart indicating that that's the parking

18   lot that extends a good deal toward the street where was the

19   car?  I obviously can't hold you to it, but generally speaking,

20   if you are up here at Olympic Sports, somewhere in here, can

21   you point out where the car was?

22   A.   To my recollection, it would be across from where --

23   somewhere between Eastern Bank and Radio Shack, I believe, or

24   Eastern Bank and McDonald's, somewhere in that area across the

25   lot, further away.

1    Q.    Closer down to the bottom of the page?

2    A.    That's correct.

3    Q.    So, it's all the way at the other side of the parking lot;

4    is that a fair statement?

5    A.    That's fair to say.

6              THE COURT:  We will mark that Exhibit A For

7    Identification.

8              MR. FEINBERG:  I'm sorry.  That was Exhibit D For

9    Identification that I was just showing him.  Oh, I'm sorry.

10   You're right, your Honor.  I forgot to.

11             THE COURT:  Well, we will do it later.

12             How much longer are you going to be with the witness?

13             MR. FEINBERG:  I am going to be quite a bit.

14             THE COURT:  So, I think this may be a good point to

15   take a morning recess.  We will take 15 minutes.

16             THE CLERK:  All rise.

17        (Defendant's Exhibit A marked for identification)

18      (The Honorable Court exited the courtroom at 11:15 a.m.)

19                    (Recess taken)

20             THE CLERK:  All rise.

21   (The Honorable Court entered the courtroom at 11:40 a.m.)

22             THE CLERK:  This Honorable Court is back in session.

23   You may be seated.

24             THE COURT:  You may continue.

25                  CONTINUING CROSS-EXAMINATION

1    BY MR. FEINBERG:

2    Q.   Before the break, Officer Allen, we were talking about the

3    situation where five of you were standing around the defendant

4    in the mall, am I correct?

5    A.   Correct.

6    Q.   And you read him his Miranda warnings, there is a

7    pat-down, you take out all the stuff and you put it on the car,

8    one of the police cars; is that correct?

9    A.   That's correct.

10   Q.   And at that point had anyone, to your recollection, gone

11   to look for a bag or sunglasses?

12   A.   Yes.

13   Q.   Who?

14   A.   The officers that arrived on-scene to assist me.

15   Q.   Who?

16   A.   Officer Matt Price, Officer Dave Gamble, Officer Marlin

17   Rivera.

18   Q.   And they left your presence?

19   A.   That's correct.

20   Q.   And you stayed there alone with the defendant; am I

21   correct?

22   A.   That's correct.

23   Q.   Did you see them take the keys off the car, off the hood

24   of the car?

25   A.   Didn't notice it, no.

1    Q.   Didn't notice it.  Do you recall Officer Price coming back

2    to you and saying that there were police officers in and around

3    the vehicle?

4    A.   I do not recall.

5    Q.   If I told you that Officer Price did say that to the

6    Secret Service, would that refresh your memory in any way?

7    A.   If he had stated that to me, I don't remember.

8    Q.   No, no, no.  I'm asking a slightly different question.

9    A.   I'm sorry.

10   Q.   I'm asking, if I told you that Officer Price reported in

11   an interview to the Secret Service that he observed police

12   officers in and around Pascu's car and he then asked them

13   whether or not they had permission or consent to search and

14   they responded that they had not specifically asked, does that

15   refresh your memory as to whether or not he reported that to

16   you?

17   A.   Not that I recall, sir.

18   Q.   So, that does not refresh your memory?

19   A.   Sir, I don't remember having that conversation with

20   Officer Price.

21   Q.   While you were alone with -- strike that.  Would it be

22   fair for you and I to characterize the defendant's use of the

23   English language as broken English?

24   A.   I'm not too sure what the exact definition of "broken

25   English" is.

1    Q.   Well, I don't know if I have an exact one, either.  I'm

2    just asking you to characterize it.  Would you agree with me

3    that his English was broken English?

4    A.   He had an accent, sir.

5    Q.   Other than the accent, was it broken or not broken?

6    A.   He had an accent.

7    Q.   When the five of you were surrounding the defendant and

8    all of the papers and keys and so on had been removed from the

9    pat frisk, was the defendant free to leave?

10   A.   He was.

11   Q.   He could have walked away?

12   A.   He could have.

13   Q.   Without his identification, correct?

14   A.   If he chose to do so.

15   Q.   Well, would you have given him back his identification and

16   his car keys at that point?

17   A.   At that time there was an ongoing investigation.

18   Q.   I didn't ask you that.  I asked you whether or not at that

19   point in time, after the pat frisk and all of the paraphernalia

20   was on the police car, if he said to you, I would like to leave

21   now, would you give him back his keys, his identification card,

22   his cell phone and so on and let him leave?

23   A.   He didn't ask, but at that time it was an ongoing

24   investigation and we would remain to hold those until we could

25   consider what was going on.

1  Q.   So, the answer to my question is no, you wouldn't let him

2  leave?

3  A.   He was free to go, but he never asked to leave.

4  Q.   I didn't ask you that, sir.  I'm asking you whether or not

5  at that point in time he was free to leave with his belongings?

6  A.   Not with his belongings.

7  Q.   So, he could walk away but he wouldn't have his

8  identification, he wouldn't have his cell phone and he wouldn't

9  have his car keys; is that what you're saying?

10  A.   Yes.

11  Q.   You never said to him, You're free to leave?

12  A.   No.

13  Q.   Another question about this period of time.  You say he

14  knelt down.  Did he kneel with his knees on the ground?

15  A.   I can't remember exactly if his knee was touching the

16  ground, but he did kneel down at some point.

17  Q.   Well, let me see if I can demonstrate.  Was he like this

18  on the ground (indicating)?  Is that what you are referring to

19  as kneeling down?

20  A.   No.

21  Q.   What are you referring to, like this, like a catcher in a

22  baseball game (indicating)?

23  A.   Pretty much crouching, correct.

24  Q.   And his knees never touched the ground?

25  A.   I don't believe so.

1   Q.   Did you have any understanding of why he was doing that?

2   A.   I did not have a clear understanding, no.

3   Q.   Well, did you have any understanding?

4   A.   No.

5   Q.   At some point did one or more police officers come back in

6   your presence?

7   A.   At the time -- after the pat frisk?

8   Q.   Yes.

9   A.   Yes.

10   Q.   Who came back into your presence?

11   A.   Pretty much the officers that arrived to assist me.

12   Q.   The same four fellows?

13   A.   Yes.

14   Q.   And did you have a conversation with them?

15   A.   Yes.

16   Q.   What did they say?

17   A.   I can't remember the exact wording, but basically the

18   items that were observed on Mr. Pascu were not located.

19   Q.   Anything else?

20   A.   I can't recall.

21   Q.   Did somebody say, What about his car?

22   A.   I can't recall.

23   Q.   Do you remember whose idea it was to search the car?

24   A.   Myself and Officer Price.

25   Q.   And did you have a conversation with Officer Price about

1    that?

2    A.    At that time, yes.

3    Q.    What was the conversation?

4    A.    I can't recall the exact wording.

5    Q.    But there was nothing in that conversation about Price

6    telling you that police officers were already in and around his

7    car?

8    A.    I don't recall.

9    Q.    You don't recall?

10   A.    No, I don't recall.

11   Q.    You would remember that, wouldn't you?  Not necessarily?

12   A.    I don't recall.

13   Q.    Was it at that point that you asked the defendant for

14   permission to search his car?

15   A.    It was around that time.

16   Q.    And you said to him, May we search your car?  Are those

17   the words you used, more or less?

18   A.    I can't remember the exact wording, but it was in English,

19   correct.

20   Q.    Well, what's the best memory of what you said?

21   A.    Can we have permission to search your car?

22   Q.    Can we have permission to search your car?  Is that what

23   you said?

24   A.    I believe so.  I can't recall the exact.

25   Q.    You used the word "permission"?

1    A.    I believe so.  I can't remember the exact wording.

2    Q.    And he nodded his head?

3    A.    Yes.

4    Q.    And then you picked up the keys from the hood and you

5    walked over to his car with Officer Price?

6    A.    I can't remember where I retrieved the keys from, but I

7    somehow obtained the keys.

8    Q.    Well, you said earlier that he gave you the keys, and then

9    you said in my questioning that the keys were on the car.

10   Which is it?

11   A.    Which is what?

12   Q.    Which is it?  Were the keys on the hood of the police car

13   or were they in his possession?

14   A.    At the time I retrieved them?

15   Q.    Yes.

16   A.    I can't remember.

17   Q.    Wouldn't it be fair to say, sir, that they were on the

18   hood of the car and you picked up the car keys and you walked

19   over to his car?

20   A.    I can't recall how and where I retrieved the keys from,

21   but I did retrieve the keys.

22   Q.    You don't have a memory of him giving you the keys, do

23   you?

24   A.    Upon his initial pat frisk.

25   Q.    No.  I'm asking you, when you asked permission to search

1   the car you can't remember whether or not he gave you the keys;

2   is that correct?

3   A.   That's correct.  I know I retrieved the keys somehow.  I'm

4   not sure if it was from his person or from off the hood.

5   Q.   And once you, as you say, "retrieved the keys," you went

6   over to his car, to the Chrysler, correct?

7   A.   Around that time, yes.

8   Q.   And you unlocked the car.  It was locked, wasn't it?

9   A.   Yes, I believe so.

10   Q.   Did you use the key to unlock it?  Did you use the

11   clicker, the remote control, to unlock the car, or did you

12   actually put the key in the lock of the door?

13   A.   I believe I used a device to unlock the door.

14   Q.   The remote control device?

15   A.   The remote control device, that's correct.

16   Q.   And who else was there with you beside Officer Price?

17   Anyone else?

18   A.   Myself and Officer Price that I can remember of.

19   Q.   And you looked in the front of the car and he looked in

20   the back seat of the car?

21   A.   I can't recall.

22   Q.   You don't remember?

23   A.   No.

24   Q.   Did you see anything in plain view?

25   A.   Yes.

1    Q.    What did you see?

2    A.    I remember seeing a -- I believe it was a bag in the back

3    seat.

4    Q.    Did you take it?

5    A.    Officer Price, I believe, looked at the bag.

6    Q.    Looked at it or took it?

7    A.    I'm not sure if he took it.  I know he looked at it.

8    Q.    Was it a carry bag?

9    A.    I can't recall.

10   Q.    Was it a travel bag?  You don't remember?

11   A.    No, I don't remember.  There was a bag, though.

12   Q.    And did you see anything else in the front seat of the

13   car?

14   A.    I can't recall.

15   Q.    Did you see any pieces of paper at that time?

16   A.    No.

17   Q.    They weren't in plain view?

18   A.    Not that I can recall.

19   Q.    Did you open the trunk?

20   A.    I can't recall.  I believe we did.  I can't recall.

21   Q.    You believe you did?

22   A.    Yeah.  I can't recall.

23   Q.    Did you see anything in the trunk?

24   A.    I'm not sure if we opened the trunk or not.  I can't

25   remember.  It was a while ago.

1    Q.   Well, was there a laptop in the trunk?

2    A.   Oh, I have no idea.

3    Q.   I'm showing you -- let me put it up on the screen.  I'm

4    showing you the spare tire section of the trunk.  Do you see

5    that on the screen?

6    A.   I do.

7    Q.   And do you see that it looks like there is a cover on it

8    that's been lifted up?

9    A.   Okay.

10   Q.   Did you lift that cover up when you looked in the trunk?

11   A.   I don't remember looking in the trunk, no.

12   Q.   You don't remember looking in the trunk at all?

13   A.   No.

14   Q.   And you say you don't recall whether you opened the trunk.

15   A.   No.

16   Q.   And you don't recall whether you opened the glove

17   compartment?

18   A.   I'm not sure if I opened it or if Officer Price opened it.

19   I can't recall.

20   Q.   Well, did you take anything with you after you searched

21   the car the first time?

22   A.   After the first time, yes.

23   Q.   What did you take from the car the first time you searched

24   the car?

25   A.   I believe it was three pieces of paper and a passport.

1    Q.    And a passport?

2    A.    That's correct.

3    Q.    And the three pieces of paper -- this is the first search,

4    now?

5    A.    No, second search.

6    Q.    Sir, I'm only talking about the first search.

7    A.    I'm sorry.  I thought you said the second search.

8    Q.    Let's start again.

9    A.    Sure.

10   Q.    In the first search did you remove anything from the car?

11   A.    No.

12   Q.    Nothing?

13   A.    No.

14   Q.    What were you looking for?

15   A.    We were looking for the items described by the reporting

16   person.

17   Q.    And because you didn't find them you didn't take anything

18   at all?

19   A.    Not that I can recall.  I didn't take anything, no.

20   Q.    Did Officer Price take anything, to your knowledge?

21   A.    I can't remember.

22   Q.    Sir, you are a police officer; you know that you had the

23   right to search the car at that point in time, am I correct?

24   A.    After getting permission, right.

25   Q.    And your job is to search and to take stuff out of that

1   car that you think may be helpful to your investigation; isn't

2   that correct?

3   A.   Correct.

4   Q.   But you didn't take anything?

5   A.   I didn't take anything, no, not that I can remember.

6   Q.   And the three pieces of paper that you say you took on the

7   second search, where were they located?

8   A.   I believe the center console.

9   Q.   Right in plain view?

10  A.   I can't recall if they were in plain view or not.

11  Q.   Well, were they in plain view or not?

12  A.   I can't recall.

13          MR. FEINBERG:  May I have a moment, your Honor?

14          THE COURT:  You may.

15                      (Pause)

16  BY MR. FEINBERG:

17  Q.   Do you recall having an interview with the Secret Service

18  on July 12th?

19  A.   I'm not sure when that was.

20  Q.   Well, you recall you had an interview with the Secret

21  Service, did you not?

22  A.   Yeah, we did, at the Cambridge Police Station.

23  Q.   Do you have that with you?

24  A.   What is it?

25  Q.   Do you recall having --

1          MR. FEINBERG:  May I, your Honor, approach?

2          THE COURT:  You may.

3     A.  Yes.

4          MR. FEINBERG:  It's not in the packet, Judge, yet.

5     BY MR. FEINBERG:

6     Q.  I'm sorry?

7     A.  Yes.

8     Q.  And present at that interview was Special Agent Raymond

9     Arcand, am I correct?

10    A.  Yes, I believe he was there.

11    Q.  And so was Assistant U.S. Attorney Amy Burkart, a woman, a

12    very pregnant woman?

13    A.  There was a female there, right.

14    Q.  I show you page 2, and I ask you to read the first

15    sentence in the first full paragraph.  Am I reading this

16    correctly?

17         "Officer Allen stated that the items found were in

18    plain view and included a passport, three sheets of paper and a

19    small medicine bag."

20         Did I read that correctly?

21    A.  You read it correctly.

22    Q.  And does that refresh your memory that the three pieces of

23    paper, the passport and the bag were in plain view in the car?

24    A.  I believe that the -- I'm not sure if the -- I really

25    can't recall.  I'm sorry.  I mean, I know that's what was

1    stated, but I can't remember if it was in plain view or not.  I

2    mean --

3    Q.   Well, that's what you told --

4    A.   That's what I told them, that's correct.

5    Q.   You agree with me that that's what you told the Special

6    Agent --

7    A.   That's correct.

8    Q.   -- in July, am I correct?

9    A.   That's correct.

10   Q.   And you are telling us now that it does not refresh your

11   memory that it was in plain view?

12   A.   It must have been, if I stated that.

13   Q.   So, it was in plain view?

14   A.   If I stated that.

15   Q.   And was it in plain view the first time you went in and

16   searched the car?

17   A.   It might have been, but in the initial search we weren't

18   looking for pieces of paper; we were looking for a bag and

19   sunglasses.

20   Q.   So, you didn't take it?

21   A.   No.

22   Q.   And you didn't take the bag?

23   A.   No.  I didn't take the bag, no.

24   Q.   And you didn't take the passport?

25   A.   No.

1    Q.   And you don't know whether Officer Price took any of those

2    three items on the first search?

3    A.   I really can't remember, to be honest.  I have no idea.

4    Q.   In your report you say that you did a "hands reach"

5    inventory" on your first search.  What's a "hands reach"

6    inventory"?

7    A.   I believe anything that you can reach with your hands upon

8    inside the motor vehicle.

9    Q.   In other words, without opening anything?

10   A.   I believe that's what it means.

11   Q.   Well, you wrote it, didn't you?

12   A.   Yes.

13   Q.   And why did you tell us that it was just a hands-reach

14   inventory the first time you went through the vehicle?

15   A.   Just trying to paint the picture of what we did.

16   Q.   In other words, you were trying to say that you didn't do

17   a complete search; is that what you're saying?

18   A.   I believe so.

19   Q.   Even though you had permission to do a complete search,

20   didn't you?

21   A.   Yes.

22   Q.   But you didn't bother to do it?

23   A.   Not that I can remember.

24   Q.   Not that you can remember?

25   A.   That's correct.  Just a -- within hands reach is what was

1    in plain view, I believe.

2    Q.   Now, after you did this first search, did you and Officer

3    Price go back to the location where the defendant was located?

4    A.   Yes.

5    Q.   And who was present then?

6    A.   The detectives.

7    Q.   The detectives had arrived by then?

8    A.   I believe so.

9    Q.   Did they arrive while you were at the car?

10   A.   Yes.  No.  They arrived before that.  Sorry.

11   Q.   Before that?

12   A.   Yes.

13   Q.   They arrived while you were standing with the defendant

14   and the other four officers?

15   A.   At the time some of the officers had left the scene to

16   respond to another call in progress.

17   Q.   Let me see if I have this straight.  You are with the

18   other four officers, you conduct the Miranda warnings, you

19   conduct the pat frisk, and at that point some of the officers

20   leave and the detectives arrive; is that what you're saying?

21   A.   That's correct.

22   Q.   Which officers left the scene altogether, if you know?

23   A.   Officer Marlin Rivera, Officer Dave Gamble and I believe

24   Officer Glenn Marshall left the scene.

25   Q.   They left completely?

1    A.    Yes.

2    Q.    In other words, they were no longer a part of this

3    investigation?

4    A.    That's correct.

5    Q.    But when they left the three detectives arrived?

6    A.    Around that time.

7    Q.    Which came first?

8    A.    I believe they left first, the officers left first.

9    Q.    So, the only officers that are with the defendant are you

10   and Officer Price at that point?

11   A.    That I can remember of, yes.

12   Q.    And you continued to talk to the defendant during that

13   period of time after they left?

14   A.    That's correct.

15   Q.    And then the detectives arrived?

16   A.    That's correct.

17   Q.    How long was it between the time you first spoke to the

18   defendant and the time the detectives arrived?

19   A.    I can't recall.

20   Q.    Can you give us your best estimate?  Fifteen minutes?

21   A.    I can't recall at all.

22   Q.    You have no memory?

23   A.    No.  It was within minutes.  I can't remember.

24   Q.    And after the detectives arrived, did they give you

25   instructions as to what to do?

1    A.    Not that I can recall, no.

2    Q.    But the detectives were there before you went over to the

3    car?

4    A.    Upon, I believe, the second search.

5    Q.    No.  I'm talking about the first search.

6    A.    Oh, I'm sorry.

7    Q.    We haven't gotten to the second search.  I'm talking about

8    the first.

9    A.    Sorry about that.  I don't believe that they were there on

10   the first search of the vehicle.

11   Q.    So, you are saying that when you came back from the first

12   search the detectives were on-scene, is that what your

13   testimony is; that they weren't there when you left to go make

14   the first search?

15   A.    Correct.

16   Q.    And at that point did you talk to the detectives?

17   A.    When they arrived on-scene?

18   Q.    Yeah.

19   A.    Yes.

20   Q.    And did you tell them that you had been to the car and you

21   had searched the car?

22   A.    I would believe so.  I can't remember, but I would believe

23   so.

24   Q.    You don't remember?

25   A.    I don't remember.

1  Q.   I'm not asking you to guess.  I'm just asking you whether

2  or not -- if you don't remember, you don't remember.

3  A.   I would believe so, but I don't remember.

4  Q.   When the detectives arrived did you essentially turn over

5  the investigation to them?

6  A.   Yes.

7  Q.   And did you stay on-scene?

8  A.   Yes.

9  Q.   How long were you on-scene?

10 A.   For the entire duration?

11 Q.   Yes.

12 A.   Approximately three to four hours, I want to say.  I'm not

13 too sure.

14 Q.   And in those three to four hours Mr. Pascu remained

15 essentially standing or kneeling in the same general vicinity

16 that he was in when you first confronted him?

17 A.   He actually moved down closer towards the Eastern Bank

18 within that period of time.

19 Q.   But there were three or four hours where there is an

20 investigation going on and Mr. Pascu is standing there,

21 correct --

22 A.   That's correct.

23 Q.   -- or kneeling within, let's say, 50 yards of where you

24 first confronted him?

25 A.   That is correct.

1  Q.   And at approximately what time did you actually put the

2  handcuffs on Mr. Pascu?

3  A.   I don't know the exact time.

4  Q.   Well, was it three or four hours after you first saw him?

5  A.   It was after -- exactly, correct.

6  Q.   Between three and four hours?

7  A.   Yes.

8  Q.   And did you then take him down to the police station for

9  booking?

10  A.   I didn't, no.

11  Q.   You did not?

12  A.   Personally I didn't, no.  He was transported.

13           (Counsel conferred off the record)

14       MR. FEINBERG:  Judge, we have the booking sheet that

15  says that the booking was at 7:54 in the evening.

16       THE COURT:  All right.

17       MR. FEINBERG:  But my brothers and I agree, and you

18  will have the video of the booking, and we don't know whether

19  that's the beginning or the end of the booking period.

20       THE COURT:  All right.

21       MR. FEINBERG:  In fact, if I could mark this as the

22  next --

23       THE COURT:  That will be Defendant's Exhibit 2.  So, I

24  will treat it as being booked in or about 7:54 p.m.

25           (Defendant's Exhibit No. 2 received into evidence)

1    BY MR. FEINBERG:

2    Q.   Officer, did you ever have the defendant put his hands on

3    the car when you pat frisked him?

4    A.   Yes, I believe so.

5    Q.   How was he positioned when you pat frisked him?

6    A.   Do you want me to show you or explain to you?

7    Q.   Well, if you can describe it.

8    A.   Both his right hand and his left hand were just placed on

9    the hood.

10   Q.   On the hood?

11   A.   On the trunk of the vehicle.

12   Q.   On the trunk of a --

13   A.   I'm sorry.  Of the police cruiser.

14   Q.   It was a cruiser?

15   A.   That's correct.

16   Q.   And it was on the trunk?

17   A.   Yes.

18   Q.   On the back?  His legs are spread and his hands are on the

19   trunk of the cruiser?

20   A.   Yes.

21   Q.   And was it you that actually did the pat frisk?

22   A.   Officer Glenn Marshall.

23   Q.   Oh, you didn't do it?

24   A.   I might have assisted him.  I can't remember.

25   Q.   Well, when you say "assisted him," what did you mean by

1    assist him?  Two people doing a pat frisk?

2    A.   That's correct.

3    Q.   How was that?

4    A.   How was that?

5    Q.   How is it that two people were doing the pat frisk?  Did

6    somebody do a pat frisk once, and then a second officer did it

7    a second time?

8    A.   Sometimes in common practice we kind of divide the body;

9    one person will do one side, and the other officer will do the

10   other.

11   Q.   Is that what happened in this case?

12   A.   It might have, I can't remember.  But a pat frisk was

13   conducted.

14   Q.   When you participated what did you actually do?

15   A.   I guess I might have pat-frisked him.  I really can't

16   remember, but a pat frisk was conducted.

17   Q.   Well, did you pat one side of his body?  You don't

18   remember whether you participated, or you do remember that you

19   participated?

20   A.   I don't remember.  I might have.  I just don't remember.

21   Q.   Do you remember seeing Officer Marshall doing the pat

22   frisk?

23   A.   I remember Officer Marshall, yes, doing the pat frisk.

24   Q.   And did he reach into any of the pockets of the defendant

25   and take stuff out?

1    A.    I'm not sure if he actually reached in or if he asked

2    Pascu to take them out.  I can't remember.

3    Q.    One way or another he removes -- all the stuff was removed

4    from the defendant's body?

5    A.    Yes.

6    Q.    Is that correct?

7    A.    That's correct.

8    Q.    Now, you say that there was a second request for

9    permission to search, am I correct?

10   A.    That's correct.

11   Q.    When was that?

12   A.    That was around the time that the detectives arrived on

13   location.

14   Q.    Did the detectives ask you to ask permission again?

15   A.    Not that I can remember, no.

16   Q.    What were the circumstances that led to the fact that you

17   asked a second time for permission to search?

18   A.    Just being that, you know, trying to locate the bag and

19   the sunglasses that were described.

20   Q.    Well, you already had permission to go in the car and you

21   had already been in the car, am I correct?

22   A.    That's correct.

23   Q.    You didn't really need to ask permission again, did you?

24   A.    I just wanted to make sure that we had permission again

25   from Mr. Pascu to search his vehicle.

1    Q.    Well, you wanted to go back to the car; is that the idea?

2    A.    That's correct.

3    Q.    Why did you want to go back to the car, because you hadn't

4    found what you were looking for?

5    A.    Exactly.

6    Q.    But you had already looked in the car.

7    A.    I understand.

8    Q.    You needed to go there again?

9    A.    Correct.

10   Q.    And this time did you do anything different than you did

11   the last time?

12   A.    Not that I remember.  Just searching the vehicle again.

13   Q.    But this time you took the stuff out; is that what your

14   testimony is?

15   A.    Yes.  Whatever was discovered was taken out.

16   Q.    Well, this time you had already seen the pieces of paper

17   in the center part of the front seat, am I correct?

18   A.    The second time?

19   Q.    No, the first.  When you went there the second time you

20   had already seen it.

21   A.    I can't remember seeing it.  I was more focused on a bag

22   and sunglasses.

23   Q.    And you don't remember seeing the pieces of paper the

24   first time?

25   A.    I can't recall, no.

1    Q.   You don't remember seeing a passport the first time?

2    A.   I can't recall, no.

3    Q.   Well, when did you take the passport and pieces of paper,

4    the second time or the first time?

5    A.   The second time.

6    Q.   Where was the passport?

7    A.   The passport was somewhere near where the three pieces of

8    paper were; I remember that.

9    Q.   In plain view?

10   A.   I believe so.  Officer Price initially was in the front

11   seat.  I was kind of more like in the back seat and then I went

12   to the front seat -- the front of the vehicle to help assist

13   with the search in the front of the vehicle.

14   Q.   Well, first you are in the back seat and then you go to

15   the front seat?

16   A.   Yes.  I opened up the back door.

17   Q.   And what did you do when you were in the back seat?

18   A.   I was looking for the sunglasses and the bag again.

19   Q.   Well, were you looking under the seat?

20   A.   I probably was.

21   Q.   Did you open the trunk the second time?

22   A.   I can't remember.

23   Q.   The second time you're searching and you don't open the

24   trunk; is that what you're telling us?

25   A.   I can't remember.  I remember looking in the back seat and

1    then coming to the front seat and looking around.

2    Q.    In the front seat did you open the glove compartment?

3    A.    I believe it was open when I got there.

4    Q.    Somebody else had opened it?

5    A.    I believe so.

6    Q.    Was it you during the first search?

7    A.    No.

8    Q.    Was it Officer Price during the first search who had

9    opened it the first time?

10   A.    During the first search?

11   Q.    Yes.

12   A.    I don't think so.  I'm not too sure.

13   Q.    Well, then maybe somebody else had opened the glove

14   compartment?

15   A.    During the first search?

16   Q.    At any time.

17   A.    I'm not too sure.

18   Q.    You don't know?

19   A.    I can't remember.

20   Q.    But you do remember that the glove compartment was open

21   when you were there the second time?

22   A.    I can't remember.  I know that there was some parts that

23   were open, but I'm not sure.  I can't recall.

24   Q.    How long after the first search did you ask permission for

25   the second search?

1    A.    Within that three-to-four hour span.  I can't remember.

2    Q.    A long period of time passed before you went back to the

3    car?

4    A.    I can't recall.

5    Q.    You don't remember?

6    A.    It was when the detectives arrived to when I initially

7    first stopped Mr. Pascu.

8    Q.    I'm sorry?

9    A.    So, it was between the time I first had a dialogue with

10   Mr. Pascu when I initially stopped him to the time where the

11   detectives arrived.  Between then.

12   Q.    That was the first time you went?

13   A.    No.  You asked how long has it been since I asked him the

14   second time, correct?

15   Q.    Let me try it again.

16   A.    Yeah, no problem.

17   Q.    The first time you went over to the car the detectives

18   weren't there?

19   A.    That's correct.

20   Q.    When you came back after the first time you went to the

21   car, the detectives were there?

22   A.    No.  When I came back -- in the initial search the

23   detectives weren't on-scene yet.

24   Q.    And when you came back from the initial search they

25   weren't there?

1    A.   No, they weren't there at the time.  No.

2    Q.   I thought you said they were.  I apologize.

3    A.   No.

4    Q.   How long after you returned to the defendant from the

5    first search did the detectives arrive?

6    A.   Like I said, I can't recall.  It was between the time we

7    initially had the dialogue and asked permission to the time the

8    detectives arrived.

9    Q.   From the time the detectives arrived to the time you asked

10   the second time for permission how much time elapsed?

11   A.   I couldn't recall.

12   Q.   Did anybody tell you you had better go back to the car and

13   search again?

14   A.   Not that I can remember, no.

15   Q.   Whose idea was it to go back a second time?

16   A.   I'm not sure if it was anyone's idea.  I think it was just

17   a conversation that myself and Officer Price had to go back and

18   search the vehicle again.  I'm not sure if it was anyone's -- I

19   can't remember whose it was.

20   Q.   Well, you had a conversation with Officer Price in which

21   the gist of it was, We had better go back and try again?

22   A.   Probably somewhere along those lines.

23   Q.   I don't want any "probably"s, sir, if you don't mind.  I

24   would like your recollection.  If you don't remember, you can

25   just say you don't remember.

1    A.    I don't remember, sir.  Sorry.

2              MR. FEINBERG:  May I have a moment, your Honor?

3              THE COURT:  You may.

4              MR. FEINBERG:  I think I may be done.

5                             (Pause)

6              MR. FEINBERG:  Your Honor, I believe I'm done with my

7    cross-examination.  I don't know whether the Court has all the

8    reports attached to the Memorandum or whether or not the Court

9    wants the third.

10             THE COURT:  Well, if somebody wants to offer them

11   substantively you can.  As I look at it right now, they can be

12   used to impeach or to refresh recollection.  So, I have looked

13   at them to orient myself.  Unless they are offered for the

14   substance of the matter, I don't treat them as in evidence.

15             MR. FEINBERG:  May I have a moment?

16             THE COURT:  Sure.  I would add one other thing.  I

17   don't believe that I have Incident Report No. 6 in the

18   collection.  I don't know what it is.

19             MR. FEINBERG:  As I understand the system, the reports

20   are from different police officers.

21             THE COURT:  Right.

22             MR. FEINBERG:  And I believe No. 6 is -- I have a No.

23   6.

24             THE COURT:  Well, in any event just so you know what I

25   have, but right now none of the reports are in evidence.

1          MR. FEINBERG:  I would like to offer the Secret

2    Service report for substantive purposes.  I believe there is no

3    objection.

4          THE COURT:  All right.  So, that will be received as

5    defendant's Exhibit 3 unless there is some other pre-marking

6    system.

7          (Defendant's Exhibit No. 3 received into evidence)

8          MR. FEINBERG:  The only other -- we are calling this a

9    chalk, Judge.  A for identification?

10         THE COURT:  Yes.  I indicated it was A For

11   Identification.  I just as soon have it just so it helps to

12   orient me as I am looking at the transcript.

13         Mr. Garland, anything further?

14         MR. GARLAND:  I will be very focused and brief in

15   redirect, your Honor.

16         MR. FEINBERG:  May I have just a moment?

17         THE COURT:  Yes.

18                     (Pause)

19         MR. FEINBERG:  Thank you, your Honor.

20                  REDIRECT EXAMINATION

21   BY MR. GARLAND:

22   Q.   Officer Allen, do you remember that you were questioned

23   about whether the defendant at some point was crouching or

24   kneeling?  Do you remember those questions?

25   A.   I do.

1    Q.   Did you or any other law enforcement officer put him in

2    that position?

3    A.   No.

4    Q.   Did he go into that position voluntarily on his own

5    without being prompted by law enforcement?

6    A.   Yes.

7    Q.   Did any of the officers at any time have their weapons

8    drawn?

9    A.   No.

10   Q.   When you asked Mr. Pascu, the defendant, for consent to

11   search his car the first time and he agreed that you could, did

12   he just nod, or did he give a verbal response as well?

13   A.   He nodded in an up-and-down motion with his head, which

14   was followed by "Yes" in English.

15   Q.   When you asked him for permission to search his car the

16   second time, did he give his assent just nodding or did he also

17   give verbal assent as well?

18   A.   Same motion followed by he replied "Yes" in English.

19   Q.   So, he gave you a verbal assent as well the second time?

20   A.   Correct.

21   Q.   The reports that you gave -- first of all, all of the

22   reports that you gave, is the information in them true and

23   accurate to the best of your recollection?

24            MR. FEINBERG:  Objection.

25            THE COURT:  Yes, unless there is some dispute about

1   it.

2          MR. GARLAND:  Your Honor, I believe that the defense

3   is --

4          THE COURT:  Well, all of them, every piece of the

5   reports?

6          MR. GARLAND:  Just the reports that he authored.

7          THE COURT:  Well, he can answer that.  You can answer

8   it.

9   A.   Yes.

10  BY MR. GARLAND:

11  Q.   You were asked a couple of questions about what you found

12  plausible and implausible about what you had heard from the

13  defendant.  Did you find it plausible that he had driven up

14  from New York City to meet somebody in Cambridge but didn't

15  know that person's --

16         THE COURT:  I think we can pass this.  If there is

17  going to be a litany of that, I do not think it is necessary.

18         MR. GARLAND:  I can save that for argument.  That's

19  all I have, your Honor.

20         MR. FEINBERG:  I have nothing else.

21         MR. BOOKBINDER:  Officer Allen, you can step down.

22                    (Witness stepped down)

23         THE COURT:  You are free to go.

24         MR. BOOKBINDER:  The Government calls Detective Flynn.

25         THE COURT:  I see that Detective Flynn has been in the

1    courtroom.

2              MR. BOOKBINDER:  I don't think so.

3              THE COURT:  Oh, I am sorry.  I thought that the

4    gentleman who got up --

5              MR. BOOKBINDER:  That's the Secret Service agent.

6              THE COURT:  You can leave the stuff there.

7              And continuing direction not to discuss his testimony

8    with any other officer; is that right?

9              MR. FEINBERG:  Thank you, Judge.

10             MR. BOOKBINDER:  We told him that.

11             THE COURT:  So, you may not talk to anybody else about

12   this until the hearing itself is concluded.

13             THE WITNESS:  I understand.

14             THE COURT:  Thank you.

15             MR. FEINBERG:  Could I just ask the Court what is

16   Exhibit 2 that I put in?

17             THE COURT:  2 was the booking record.

18             MR. FEINBERG:  Oh, the booking sheet.

19             OFFICER THOMAS FLYNN DULY SWORN BY THE CLERK

20             THE CLERK:  Please state and spell your full name for

21   the record.

22             THE WITNESS:  Thomas Flynn, F-L-Y-N-N.

23             THE COURT:  You may inquire.

24                        DIRECT EXAMINATION

25   BY MR. BOOKBINDER:

1    Q.    How are you employed?

2    A.    With the Cambridge Police Department.

3    Q.    What's your title with the Cambridge Police?

4    A.    I am a detective.

5    Q.    How long have you been a detective?

6    A.    Since January of this year.

7    Q.    Before becoming a detective, what did you do?

8    A.    I worked patrol.

9    Q.    How long were you a patrolman before becoming a detective?

10   A.    Approximately eight years.

11   Q.    Were you working on the afternoon of April 30th of this

12   year?

13   A.    Yes, I was.

14   Q.    Where were you that afternoon before about 2:00?

15   A.    Before 2:00 I was at home.  I was scheduled to work on the

16   4:00 to midnight shift.

17   Q.    At around 2:00 did you hear a radio transmission?

18   A.    Yes.  I came in early that afternoon.  I was on my way

19   into the station, and I had my radio on and I heard a radio

20   transmission, yes.

21   Q.    Generally speaking, what was that transmission reporting?

22   A.    Suspicious person at the Fresh Pond Mall ATM area.

23   Q.    Did you hear another transmission following up on that

24   from a detective?

25   A.    Yes.  Detective Atherton asked responding units to go to

1    another channel, Channel 5.  It's a communications channel

2    other than Dispatch.  It's a secondary channel that we have.

3    Q.   Did you also go to that channel?

4    A.   Yes, I did.

5    Q.   What happened on that channel?

6    A.   Detective Atherton reminded the responding units of a

7    regional ATM theft ring that has been going, working in the

8    area.

9    Q.   At some point later on that afternoon did an officer

10   request detectives to respond to the scene of that incident?

11   A.   Yes.

12   Q.   Were you one of the detectives who did respond?

13   A.   Yes.  At that point I was at the station, and Officer

14   Allen requested Detective Atherton respond to the mall area,

15   and Detective Atherton, Detective Brian O'Connor and I

16   responded.

17   Q.   When you got to the mall area -- first of all, this is the

18   Alewife Brook Parkway area?

19   A.   That's correct.

20   Q.   Where did you go?

21   A.   We went to the location where patrol was, which was in

22   front of the Eastern Bank.

23   Q.   When you arrived there, who was there?

24   A.   Detective Allen -- I'm sorry.  Officer Allen, Officer

25   Marshall, Officer -- there were a few officers there.  I don't

1    recall specifically.

2    Q.    Who were they talking to?

3    A.    Mr. Pascu.

4    Q.    Do you recognize him in the courtroom today?

5    A.    Yes, I do.

6    Q.    He is sitting at defense counsel table there; is that

7    correct?

8    A.    Yes.  He's seated at defense counsel with the white

9    T-shirt, undershirt, correct.

10   Q.    Did you approach him and the other officers at that point?

11   A.    Yes, I did.  I approached Mr. Pascu and I introduced

12   myself to him.

13   Q.    Did you then have a conversation with him?

14   A.    Yes, I did.

15   Q.    Can you describe, as best you remember it, that

16   conversation?

17   A.    I informed Mr. Pascu that we were there to investigate

18   suspicious activity at the ATM.

19   Q.    Did he say anything about the ATM?

20   A.    Yes.  He stated that he was inside of the ATM and that he

21   had gotten a brochure but had since thrown it out.

22   Q.    Did he say whether he had used the ATM to get money or

23   anything else?

24   A.    I don't believe he used the ATM.  He said that -- he put

25   his hood up and down and put his hood up again, and he stated

1  that, "The blacks walk around like this all the time.  You're

2  stopping me because I'm white."

3  Q.   So, he actually demonstrated for you putting his hood up

4  and then down?

5  A.   Yes.

6  Q.   Had you asked him anything about his hood?

7  A.   No.

8  Q.   That was spontaneous on his part?

9  A.   Yes.

10  Q.   Did he explain to you why he was at that particular

11  shopping plaza that afternoon?

12  A.   Yes.  He informed me that he had driven down from New York

13  by himself to meet a woman named Roberta that he had met in New

14  York 10 days prior at a bar.

15  Q.   Did he tell you what time he was supposed to meet Roberta

16  there?

17  A.   Yes.  He stated he was to meet Roberta at 2:30.

18  Q.   Were you there that day past 2:30?

19  A.   Yes.  We were there well past 2:30, yes.

20  Q.   Did you see anybody appear who identified herself as

21  Roberta?

22  A.   No.

23  Q.   So, he said he had met Roberta in a bar -- I'm sorry --

24  did you say 10 days earlier?

25  A.   In New York, yes.

1    Q.    Did he tell you where in New York -- well, let me strike

2    that.  Did he tell you where he was staying during his time in

3    the United States?

4    A.    Yes.  He informed me that this was his second time in the

5    States.  He was staying with friends.  He was there on vacation

6    and staying with friends in New York, though he could not

7    recall the borough or where in New York he was staying.  He

8    said he would know it by driving to it.

9    Q.    Had you asked him specifically where he was staying, and

10   that was his response?

11   A.    Yes, that's correct.  I asked him where in New York he was

12   staying and he said he did not know whereabouts, but he would

13   drive there.

14   Q.    At that point what was your assessment of the credibility

15   of what Mr. Pascu had told you?

16   A.    At that point I didn't believe he was being -- it was

17   after 2:00 to 2:30.  I was still unsure.

18   Q.    Unsure about whether it was credible?

19   A.    Yes.  I wasn't sure.  I didn't believe that he was, in

20   fact, waiting for Roberta.  I was unsure at that point.

21   Q.    At some point during your conversation with Mr. Pascu did

22   you leave and go somewhere else in that mall?

23   A.    Yes.  Mr. Pascu informed me that while waiting for Roberta

24   he had lunch at McDonald's, and he also indicated that he was

25   looking at luggage and pointed down the strip mall.  I then

1    left his side and went down to T.J. Maxx to see if I could see

2    video surveillance.

3    Q.    Let me stop you there.

4    A.    Okay.

5    Q.    You said you went to T.J. Maxx.  Did he point in that

6    direction when he said he was looking for luggage?  Is that why

7    you went there?

8    A.    That's correct, yes.

9    Q.    So, you went down to the T.J. Maxx store.  What did you do

10   when you were there?

11   A.    I spoke with Loss Prevention and went back into their Loss

12   Prevention room where I viewed video surveillance to see if

13   Mr. Pascu had entered the store.

14   Q.    Did you learn anything from that video?

15   A.    Yes.  I spent about 20 minutes with Loss Prevention, and

16   we did not observe Mr. Pascu to come into the store.

17   Q.    On the videotape?

18   A.    On the videotape, correct.

19   Q.    After your time with Loss Prevention at T.J. Maxx, where

20   did you go?

21   A.    I responded back with Mr. Pascu.

22   Q.    You walked back to where he was?

23   A.    That's correct.

24   Q.    He was still in the vicinity of the Eastern Bank on the

25   sidewalk?

1   A.   Correct.  Mm-hmm.

2   Q.   When you got there did you talk to him, have another

3   conversation?

4   A.   Yes.  Yes, we did.  We had a lengthy conversation.

5   Q.   When you say "lengthy," can you estimate sort of

6   approximately how long you spoke to him?

7   A.   Maybe two hours.

8   Q.   Do you remember any of the details that you discussed with

9   him during that time?

10  A.   We spoke about his family.  He informed me that he has a

11  wife and a one-year-old boy at home in Romania.  We talked

12  about his wife owns a 70-seat Greek restaurant in Germany that

13  does well.

14  Q.   Let me stop you right there.  He said that his wife owned

15  a did you say 70-seat --

16  A.   Correct, yes.

17  Q.   -- Greek restaurant in Germany?

18  A.   Correct.

19  Q.   Go on.  What else do you remember from that conversation?

20  Let me ask you, do you remember whether he said anything about

21  what his job was?

22  A.   Yes, he did.  We spoke about his employment.  He stated

23  that he was a driver for a woman who owns a construction

24  company and he drove a Mercedes.  He drove her in a Mercedes.

25  Q.   Did he tell you what country he lived in where all these

1   things were going on, where he had this job, for example?

2   A.   Romania.

3   Q.   So, he was a driver for someone who owned a construction

4   company.  Did he use those words, "construction company"?

5   A.   Yes.  He drove for a woman who owned the company, correct.

6   Q.   Did he tell you what kind of car he drove for her?

7   A.   A Mercedes, yes.

8   Q.   Was that his own personal car, did he say, in Romania?

9   A.   No.  He also stated he drove a smaller car in Romania.  I

10  don't recall the name of the car that he drove.

11  Q.   Did you have any discussion with him about your car?

12  A.   Yes.  He asked me about the unmarked Crown Victoria that

13  we arrived in.

14  Q.   What did he ask you?

15  A.   I believe he asked the horsepower.  He asked about the

16  horsepower or the engine, something to that effect.

17  Q.   Did you tell him?  Did you know what the horsepower was?

18  A.   No.  I don't know too much about vehicles.  I then asked

19  him about Roberta, about his meeting Roberta despite having a

20  wife and child at home.

21  Q.   How did he respond to that?

22  A.   He smiled at me and shrug his shoulders.

23  Q.   During the time you were out at the plaza did you have any

24  conversation with him about music?

25  A.   Yes.  At some point a vehicle drove by playing loud rap

1    music, and he asked me if I liked rap music.

2    Q.   What did you say?

3    A.   I shook my head indicating that I did not like rap music.

4    Q.   Was there any followup on that?

5    A.   Yes.  I asked him what kind of music he liked to listen

6    to.

7    Q.   What did he say?

8    A.   He told me that he enjoyed techno music and his favorite

9    band was *The Gypsy Kings*.

10   Q.   Were you familiar with that band?

11   A.   No.  No, I'm not.

12   Q.   Did you do anything to follow up on that reference?

13   A.   Yes.  We were both standing up against, leaning up against

14   the unmarked Crown Victoria and I took out my phone which has

15   the Internet, and I went to Google and I typed in "Gypsy King."

16   Q.   What, if anything, did he do at that point?

17   A.   He corrected me in the spelling of *Gypsy Kings*.

18   Q.   How had you spelled it initially, do you remember?

19   A.   I don't recall if I spelled it with a "J."  I'm not sure

20   how I spelled it, but he corrected me on the spelling.

21   Q.   When you say he corrected you, first of all, how did he

22   see what you had done?

23   A.   He was standing to my left, and I had my cell phone out

24   and was typing.  I was typing the band *The Gypsy Kings* into

25   Google.

1    Q.   When he corrected you did he take the phone, or did he

2    just say something?

3    A.   I believe -- I don't recall how he corrected me.

4    Q.   So, he corrected it, and then you typed in a different

5    spelling?

6    A.   Yes.  I typed in the correct spelling, I believe, for

7    *Gypsy Kings*, correct.

8    Q.   How do you know that it was the correct spelling?

9    A.   The video, the music video, and the song *Gypsy Kings* came

10   up on, I don't know if it was You Tube or -- the video played

11   on the cell phone.

12   Q.   During this time when you were talking to him, how would

13   you describe his general demeanor?

14   A.   Friendly young man, personable.

15   Q.   Did he appear to you to be afraid?

16   A.   No.

17   Q.   During the time you were with him, did you have any

18   trouble understanding what he was saying?

19   A.   No, I did not.

20   Q.   Did he ever tell you that he didn't understand what you

21   were saying?

22   A.   He did at one point.

23   Q.   When was that?

24   A.   I had asked him if I could call Roberta, and he provided

25   me a phone number.  It was a 646 number.  He provided that

1    number to me and I made a phone call.  The phone rang and a

2    voicemail answering machine came on.  It was of a male

3    indicating some sort of a construction company:  This is so and

4    so from whatever construction company it was.  I did not leave

5    a voicemail.  I then told Mr. Pascu of my findings, that it was

6    not a female, that it was someone that identified themselves as

7    having to do with a construction company.

8    Q.   Did he react at all?  What did he say?

9    A.   Yes.  He wasn't sure what I was talking about

10   "construction."  He had difficulty understanding "construction"

11   at that point.

12   Q.   Did you clarify for him what you meant?

13   A.   Yes.  I said "Construction.  You just told me that you

14   worked for a construction company, you drove for a woman who

15   owns a construction company.  Construction."

16   Q.   Did he ever give you another number where you could reach

17   Roberta?

18   A.   No, he did not.  I asked him if he had saved the number in

19   his cell phone or if it may have been in his call log, and it

20   was not.

21   Q.   He told you he didn't have a number anywhere on his phone?

22   A.   Correct.

23   Q.   What was your assessment of the credibility of that?

24   A.   I found that his story that he was there to meet Roberta

25   was becoming less and less credible.

1   Q.   Did you have any conversation with Mr. Pascu about any

2   items that had been taken from his car?

3   A.   Yes.  There were papers on the trunk or somewhere on top

4   of one of our vehicles, and within those papers was a City of

5   Boston parking violation.

6   Q.   What did you ask him about that?

7   A.   I showed the violation to Mr. Pascu.  I believe it was a

8   residential fine.

9   Q.   Do you remember when it was dated relative to the date you

10  were there April 30th?

11  A.   Yes.  It was dated sometime -- I don't recall

12  specifically, but it was dated sometime within that week, as I

13  recall.

14  Q.   When you showed it to him did you ask him anything about

15  it?

16  A.   Yes.  He stated that he had come down from New York by

17  himself to meet Roberta either Tuesday or Wednesday and that he

18  and Roberta had spent the night at a hotel in Boston.

19  Q.   Did you follow up on the mention of the hotel in Boston?

20  A.   I asked if he recalled whereabouts, and he stated he did

21  not recall where in Boston he stayed.

22  Q.   What, if anything, did he say was the name of the hotel?

23  A.   He did not.

24  Q.   Did you ask him?

25  A.   I believe so, and he stated he didn't recall, and he

1   didn't recall where it was that he stayed, correct.

2   Q.   Was Mr. Pascu arrested later that afternoon?

3   A.   Yes, he was.

4   Q.   When he was arrested was he then transported back to the

5   station?

6   A.   Yes, he was.

7   Q.   Did you go back as well around that time?

8   A.   Yes, I did go back shortly after.

9   Q.   Back at the Cambridge Police Department, did you talk to

10  Mr. Pascu there?

11  A.   Yes, I did.

12  Q.   What, if anything, did he say to you at that point?

13  A.   I asked if he would be willing to speak with a detective

14  or with an agent with regards to his being placed under arrest.

15  Q.   What did he say?

16  A.   He stated that he would like to speak with someone who

17  spoke either Romanian or Italian.

18  Q.   How did you respond to that?

19  A.   I told him that the conversation that we had at the mall

20  was perfectly fine.

21       MR. FEINBERG:  I'm sorry.  I didn't hear the end of

22  it.

23  A.   That the conversation that we had at the mall was fine,

24  that he spoke and understood English just fine.

25  BY MR. BOOKBINDER:

1    Q.   What did you do in response to his request to speak to

2    someone who spoke Italian or Romanian?

3    A.   I notified the Shift Commander, Lieutenant Hogan, of his

4    request.

5    Q.   How would you compare his English communication at the

6    police station versus how it was at the mall that afternoon?

7    A.   I don't believe that we really spoke all that much at the

8    station itself.

9    Q.   So, you couldn't really compare it?

10   A.   (No response).

11   Q.   Okay.  Did you participate in the search --

12            MR. FEINBERG:  I gather that was a no?

13            THE COURT:  You do have to answer for the record.

14            THE WITNESS:  I'm sorry, your Honor.

15            The question again, please.

16   BY MR. BOOKBINDER:

17   Q.   Whether you could compare how well he was communicating in

18   English at the police station versus how well he was

19   communicating at the scene at the mall.

20   A.   He spoke with me.  We had no problem understanding each

21   other at the mall.  At the station I don't believe I had much

22   -- we didn't speak like we did at the mall.  We didn't speak at

23   the station like we did at the mall.

24   Q.   At the mall did you participate in searching his car?

25   A.   No.

1    Q.   How about back at the police station?

2    A.   Yes.  I assisted Detective O'Connor and an agent.

3    Q.   What kind of a search were you doing back at the Police

4    Department?

5    A.   An inventory search.

6    Q.   Was that according to a standard Cambridge Police

7    procedure?

8    A.   Yes.

9    Q.   Can you describe what you do in an inventory search?

10   A.   We search the vehicle for any valuables, we assess the

11   damage of the vehicle interior and exterior, and we did this

12   back at the station.

13   Q.   What did you find?

14   A.   I believe we found a GPS in the front compartment of the

15   vehicle, and in the trunk under the floorboard, under the floor

16   mat in the rear in the wheel well was a computer.

17   Q.   I would like to show you what's been marked as Exhibit 1.

18        MR. BOOKBINDER:  May I approach, your Honor?

19        THE COURT:  You may.

20        MR. BOOKBINDER:  This is Government's Exhibit 1.  We

21   have premarked them, if it doesn't cause any confusion.  Here

22   is a copy for the Court.

23   BY MR. BOOKBINDER:

24   Q.   Do you recognize that photo?

25   A.   Yes, I do.

1   Q.    What is it?

2   A.    This picture depicts the trunk area underneath the floor

3   mat viewing the spare tire with the computer, the laptop

4   computer, on top, white laptop on top.

5   Q.    That's Mr. Pascu's car that day, correct --

6   A.    That's correct.

7   Q.    -- during the inventory search?

8   A.    Correct.

9   Q.    Did you take that picture?

10  A.    I believe Detective O'Connor took -- I don't recall if I

11  took this photo or not.  I don't recall.

12          MR. BOOKBINDER:  Your Honor, the Government offers

13  Government's Exhibit 1.

14          THE COURT:  It is received.

15          (Government's Exhibit No. 1 received into evidence)

16          MR. BOOKBINDER:  If I may just have a moment, your

17  Honor?

18          THE COURT:  Yes.

19                    (Pause)

20          MR. BOOKBINDER:  Nothing further, your Honor.

21          THE COURT:  All right.

22          Mr. Feinberg.

23          MR. FEINBERG:  May I have a moment, your Honor?

24          THE COURT:  Yes.

25  (Atty. Feinberg conferred with defendant off the record)

CROSS-EXAMINATION

BY MR. FEINBERG:

Q.   Good afternoon, Detective.

A.   Good afternoon.

Q.   Just a few questions.  Do you have a memory as to when you arrived at the mall?

A.   Specifically the time?

Q.   Approximately.  I'm not going to hold you to a minute.

        Let me see if I can help you a little bit.  According to Officer Allen, the incident began at about 2:00.

A.   Yes.

Q.   And at some point after that you received a call at the Cambridge Police Department?

A.   Correct.  On the radio, correct.

Q.   And do you have any memory as to when you arrived?

A.   Specifically, no, I do not.

Q.   Was it sometime after 2:15, let's say, or you don't want to pin it down?

A.   Yes, I would say it was sometime after 2:30.

Q.   Sometime after 2:30.  When you arrived there were several other police officers there, am I correct?

A.   Yes, correct.

Q.   And you say you don't remember exactly who?

A.   That's correct.

Q.   You do remember that Officer Allen was there?

1    A.    Yes.

2    Q.    Do you remember an Officer Price being there?

3    A.    Yes, Officer Price was there as well.

4    Q.    And do you remember an Officer Gamble?

5    A.    Officer Gamble and Officer Marshall, yes.

6    Q.    And was there an Officer Rivera there?

7    A.    Yes.

8    Q.    So, you remember at least those five?

9    A.    Yes, correct.

10   Q.    And do you remember that there were a couple of narcotics

11   detectives there or maybe officers?  I'm not sure which.

12   A.    I don't know if they were there when I arrived, but I do

13   know that they were there based on the radio transmissions that

14   I had overheard.

15   Q.    Did you actually see them there?

16   A.    I don't believe I did.

17   Q.    Do you know whether or not they were Officer Kevin

18   Donofrio?

19   A.    I know that Officer Brian Hussey was there and Kevin

20   Donofrio was his partner, so I would believe that Donofrio and

21   Hussey were there at some point.  I am not sure if they were

22   there.  They may have cleared by the time we arrived.

23   Q.    So, you don't know whether they were there before you

24   arrived and left or came before you arrived and you arrived but

25   you didn't see them and they left after you arrived, something

1    like that?

2    A.    That's correct.  I know they arrived before we arrived,

3    and I'm not sure if they had cleared prior to us arriving.

4    Q.    When you say "cleared," just for the record, do you mean

5    get permission to leave the scene?

6    A.    Leaving the scene, yes, correct.

7    Q.    When you arrived the scene was several officers around the

8    defendant in an area of the sidewalk in front of the mall

9    within close proximity to the Eastern Bank.  Is that a fair

10   statement?

11   A.    Yes.

12   Q.    And next to where the officers and the defendant were

13   standing there were at least three police cars, am I correct?

14   A.    Two cruisers, and I believe Officer Price was operating a

15   wagon, correct.

16   Q.    And then there was, of course, your car?

17   A.    Correct.

18   Q.    The three of you came together --

19   A.    That's correct.

20   Q.    -- yourself and Detectives O'Connor and Atherton, am I

21   correct?

22   A.    Yes, sir.

23   Q.    And when you arrived you saw a bunch of stuff on the hood

24   of one of -- or the trunk of one of the police cars, am I

25   correct?

1    A.   I believe so, yes.

2    Q.   What was it, do you remember?

3    A.   I believe it was papers, possibly his passport.  I don't

4    recall specifically what was located on the trunk.

5    Q.   Do you remember whether or not there were pieces of paper

6    with addresses on it on the trunk?

7    A.   I believe that there may have been.  Officer Brian

8    O'Connor is more highly trained, and he is a Financial and

9    Computer Task Force, so it wasn't going to be my case.  I

10   introduced myself to Mr. Pascu, and I stayed with him.  It

11   wasn't --

12   Q.   It wasn't what?

13   A.   It wasn't going to be my case.  It was either Detective

14   Atherton's or Detective Brian O'Connor's, where he is more

15   highly trained.  So, I went along for the ride.  I assisted

16   them.

17   Q.   All I'm asking you for, sir, is your memory.

18   A.   Correct.

19   Q.   And your memory is that you saw some papers on the hood?

20   Was it the hood or the trunk of the car?

21   A.   I don't recall.

22   Q.   Well, it was in plain view on the top of the car at some

23   place, either the hood or the trunk or the roof, am I correct?

24   A.   I don't recall seeing the papers.  I spoke with Mr. Pascu.

25   That was my --

1    Q.   You wrote a report, didn't you?

2    A.   Yes, I did.

3    Q.   And the report was written the next day?

4    A.   That night.

5         MR. FEINBERG:  May I approach, your Honor?

6    BY MR. FEINBERG:

7    Q.   I am showing you your report at page 3, the underlined

8    part right here (indicating).  Why don't you read it to

9    yourself, and I am going to ask you whether that refreshes your

10   memory.

11   A.   (Witness complied).

12   Q.   It does?

13   A.   Yes.

14   Q.   Let me ask it again.  On the hood of one of the unmarked

15   Crown Victorias were some miscellaneous papers; is that

16   correct?

17   A.   Correct.

18   Q.   Pertaining to the investigation that it had been removed

19   from the defendant's car; is that correct?

20   A.   Correct.

21   Q.   And you had nothing to do with the removal of those papers

22   from the car, did you?

23   A.   That's correct.

24   Q.   But somebody must have told you that that's where they

25   came from.

1   A.   Yes.

2   Q.   And what I'm asking you is, do you recall whether or not

3   there were pieces of paper with writing on them?

4   A.   Specifically I do not.

5   Q.   But one of the pieces of paper you do remember, which was

6   I guess a traffic ticket or a parking ticket.

7   A.   Correct.

8   Q.   The other papers you don't remember; is that correct?

9   A.   Correct.

10   Q.   Did you have conversations with anybody or did you

11   overhear conversations that anyone had about the search of

12   Mr. Pascu's car?

13   A.   I don't believe that I had any conversations with that.

14   That would have been Detective Atherton or O'Connor.

15   Q.   Do you remember overhearing any conversations that went on

16   amongst the other police officers about the search of the car?

17   A.   No, I do not.

18   Q.   And at the time you arrived, I thought you said that when

19   you arrived you began a conversation and the defendant said

20   that he was meeting this Roberta at 2:30.

21   A.   Correct.

22   Q.   Does that help you in indicating that you arrived before

23   2:30?

24   A.   We arrived after 2:30, to my recollection.

25   Q.   How much after 2:30?

1    A.   I don't recall specifically.

2    Q.   And then you were there on-scene for at least a couple of

3    hours?

4    A.   Correct.

5    Q.   And when you were on-scene you really weren't doing

6    anything except standing with the defendant while other

7    officers were engaged in their investigation, is that a fair

8    statement, except for that 20 minutes at the T.J. Maxx?

9    A.   Yes, that's correct.

10   Q.   During the time that you were in the T.J. Maxx do you know

11   who was staying with the defendant?

12   A.   Specifically, no, I don't recall.

13   Q.   Was somebody?

14   A.   It wasn't as though I handed them -- someone was standing

15   with him, I would say so, yes.

16   Q.   But you just don't remember who?

17   A.   Correct.

18   Q.   In other words, he wasn't left alone?

19   A.   No.

20        MR. FEINBERG:  May I have a moment, your Honor?

21        THE COURT:  You may.

22                  (Pause)

23        MR. FEINBERG:  I'm sorry.

24   BY MR. FEINBERG:

25   Q.   I'm sorry; I didn't catch that.  You said that you found a

1   GPS back at the station?

2   A.   I believe a GPS was located.  I believe that one was, yes.

3   Q.   You're not sure?

4   A.   I'm not sure.  I don't believe I had it in my report.

5   Q.   So, you're not sure whether the GPS was seized pursuant to

6   an earlier search or the inventory; is that what you're telling

7   us?

8   A.   I assisted on the inventory.  I believe Detective

9   O'Connor, he may have written a report on it to specify what

10  was found.

11  Q.   Okay.  All I'm asking you is whether you have any

12  recollection or whether you can testify that the GPS was found

13  at the inventory search or not, and is it your testimony that

14  you cannot specify when it was found?

15  A.   I believe the GPS was located while at the station.

16  Q.   That's your best memory?

17  A.   That's my best memory, correct.

18  Q.   Do you know where it was located in the car?

19  A.   I believe it was located within the front passenger

20  compartment somewhere.

21  Q.   Were you present when the defendant was arrested?

22  A.   Yes.

23  Q.   And about what time of day was that?  When I say

24  "arrested," in other words, actually had the cuffs put on and

25  so on.

1    A.    Yes, I was.

2    Q.    And about what time was that?

3    A.    Again, specifically I'm not sure.  I believe it should be

4    in either the Computer-Aided Dispatch report, or I don't

5    believe that I have it located within my specific -- in my

6    report.

7    Q.    Your best memory as to how long you were at the location

8    before the arrest occurred.

9    A.    Oh, I would say two hours.

10   Q.    About two hours?

11   A.    Yes.

12   Q.    Maybe more?

13   A.    Maybe more, yes.

14   Q.    When you were speaking with the defendant you say that you

15   understood him and he understood you?

16   A.    Yes.

17   Q.    Did he have an accent?

18   A.    Yes, he did.

19   Q.    Was it a heavy accent?

20   A.    He spoke with an accent, yes.

21   Q.    And the conversation that you had spanned the full

22   two-hour period, on and off?

23   A.    Yes.

24   Q.    Did you use hand gestures at all?

25   A.    I may have at one point that I recall now, yes.

1    Q.   And were there times when you had to change the words you

2    were using to make him understand?

3    A.   The one time I am referring to specifically we were

4    talking about our families, and I mentioned that my wife was

5    pregnant with I believe I mentioned -- I said "bambino," which

6    in Spanish I believe means "baby."  I mentioned "bambino."

7    Q.   So, you used a different language to indicate that?

8    A.   Yes.  It was in casual conversation.

9    Q.   Sure.

10   A.   Yes.

11   Q.   Did you use the word "bambino" because he told you that he

12   understood Italian?

13   A.   I meant it as Spanish.  I believe it's -- I took four

14   years of -- bambino --

15   Q.   Is "bambino" the same in Italian?

16   A.   I didn't do very well in Spanish, but --

17   Q.   Were there other occasions when you used English words

18   that he didn't understand and you changed the words in an

19   effort to make him understand?

20   A.   The second time on "construction."  That's the only

21   specific recollection that I have when we had difficulty

22   understanding each other was the second time I mentioned

23   "construction."

24   Q.   Did he speak in whole sentences to you in English?

25   A.   I don't recall if they were whole, if they were -- I don't

1    recall.

2    Q.   Usually just a word or two?

3    A.   No, it was more than that.

4    Q.   But not always a full sentence?

5    A.   Probably not always a full sentence, but he communicated

6    very effectively, and he told stories.  So, he communicated

7    just fine.

8            MR.  FEINBERG:  Thank you, your Honor.  I have nothing

9    else.

10           THE COURT:  Mr. Bookbinder?

11           MR. BOOKBINDER:  Nothing from the Government, your

12   Honor.

13           THE COURT:  All right.  You may step down.  Thank you.

14           THE WITNESS:  Thank you, your Honor.

15                     (Witness stepped down)

16           THE COURT:  So, in terms of timing, I think we have it

17   set for 9:30 on --

18           MR. FEINBERG:  Wednesday.

19           THE COURT:  -- Wednesday.  Can we move it forward to

20   9:00?

21           MR. GARLAND:  That should be no problem for the

22   Government.

23           MR. FEINBERG:  I think we should be able to finish

24   either way by using Wednesday morning.  I would hope so, but

25   9:00 would be --

1          THE COURT:  I have got the whole day set up, but I

2     would just as soon start at 9:00 and if we spill over -- I

3     think I have.

4          MR. FEINBERG:  I didn't think we did.

5               (Pause)

6          THE COURT:  Yes, it is the only case on.  That is not

7     a solicitation to spend time, but it is available.  I want to

8     complete the testimony.

9          MR. FEINBERG:  I would certainly hope that with the

10    whole day we would get there, Judge.

11         MR. GARLAND:  Yeah.  We just have two more witnesses,

12    and I understand the defense is going to call a couple of

13    witnesses as well.  Then there are portions of the booking

14    video that the Government wants to play, only about 15 minutes.

15    I don't know how much of the interrogation video the defense

16    wants.  Also, if the Court wants to just review it in Chambers

17    outside of the parties, we have a copy we can give to the

18    Court.

19         THE COURT:  Is it *War and Peace*, or is it a cartoon?

20         MR. FEINBERG:  We could create it, I think.  It's all

21    on one disc, but there are two other portions of that disc that

22    we both agree are not going to be played.

23         THE COURT:  If you can give me a composite that has

24    that which you want me to view that would be helpful, and I can

25    do it on my own time, rather than having you sit here watch me

1    watch it.

2              MR. FEINBERG:  That's fine.

3              MR. GARLAND:  That's fine.  And if we are unable to do

4    that, would it suffice the Court just to identify the portions?

5              THE COURT:  Yes, if it has got a clock on it or

6    something.

7              MR. GARLAND:  It does.

8              MR. FEINBERG:  I have a copy just of the interview, so

9    if the Government wants to just create what they want to

10   present, I can just give you what I have.

11             THE COURT:  Well, then, why don't you give it to me,

12   if you want to give it to me now.  I may get the opportunity to

13   review it before --

14             MR. GARLAND:  We will try to create a smaller snippet

15   for the Court tomorrow.

16             THE COURT:  All right.

17             MR. GARLAND:  And if not, we will give you a copy with

18   the minute locations on it.

19             MR. FEINBERG:  We have agreed that this would go in

20   and I'm attaching --

21             THE COURT:  You are saying "this."

22             MR. FEINBERG:  I'm sorry.  The actual copy of the

23   video interrogation, together with just three pieces of paper,

24   something in Italian that has to do with his consular rights,

25   Miranda warnings in Italian and English.

1              And that's all, isn't it?

2              MR. GARLAND:  That's right.

3              MR. FEINBERG:  The only reason we would put that in is

4    to put the whole, so that when it's viewed you will know what

5    they are looking at.

6              THE COURT:  All right.

7              MR. GARLAND:  No objection.

8              MR. FEINBERG:  I ask that this be a single exhibit.

9              THE COURT:  Instead of marking it at this point, I

10   will just take a look at it.  You will introduce it and we will

11   mark it specifically.

12             MR. FEINBERG:  That's fine.

13             THE COURT:  All right.  So, 9:00 on Wednesday morning.

14             MR. GARLAND:  And does your Honor expect to have

15   argument that day?  We are prepared to do so.

16             THE COURT:  It is up to you.  Do you want to do an

17   argument, do you want to review a transcript?  What is the

18   story?

19             I will authorize the transcript for you if you want

20   it, Mr. Feinberg.

21             MR. GARLAND:  We will be prepared to argue it right

22   that day.

23             MR. FEINBERG:  I can go either way.  Is the Court

24   going to want a further memo from me?

25             THE COURT:  Anything is helpful, but if you think it

1    is properly laid out now, I can deal with it now and then we

2    would have argument.

3         MR. FEINBERG:  I think I should be able to just do

4    argument.

5         THE COURT:  All right.

6         MR. FEINBERG:  And I may ask to submit a short memo.

7         THE COURT:  Well, so look forward, as I do, to

8    argument on Wednesday.  All right.

9         THE CLERK:  All rise.

10        (The Honorable Court exited the courtroom at 1:00 p.m.)

11         (WHEREUPON, the proceedings adjourned at 1:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Reporter

5      of the United States District Court, do hereby certify that the

6      foregoing transcript constitutes, to the best of my skill and

7      ability, a true and accurate transcription of my stenotype

8      notes taken in the matter of *United States of America v. Razvan*

9      *Pascu*, No. 1:11-cr-10199-DPW-1.

10

11

12

13

14

15     Date:October 7, 2011            /s/ *Brenda K. Hancock*

16                                     Brenda K. Hancock, RMR, CRR

17                                     Official Court Reporter

18

19

20

21

22

23

24

25