## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

|                                        |                              |
|----------------------------------------|------------------------------|
| **UNITED STATES OF AMERICA**           |                              |
| **v.**                                 | **Crim. No. 11-CR-10199-DPW** |
| **RAZVAN PASCU**                       |                              |
| **Defendant**                          |                              |

### GOVERNMENT'S SUPPLEMENTAL BRIEF RE: MOTION TO SUPPRESS

The testimony and exhibits confirm the Government's original arguments to deny Defendant's motion to suppress.

### FACTS[1]

On April 30, 2011, a citizen reported that Defendant Pascu was acting suspiciously at Cambridge's Fresh Pond Mall by going between his car and an ATM, raising his hood and putting on sunglasses when entering the ATM vestibule, and lowering the hood and taking off sunglasses when leaving the ATM, even though the day outside was sunny. Officer Allen arrived at the mall, the citizen identified Defendant.[2]

---

[1] Natural variations in the witnesses' testimony make constructing a minute-by-minute chronology impossible. The Government therefore does not necessarily concede the accuracy of Defendant's chronology. Ultimately what happened minute-by-minute is less important than the material facts, which the witnesses largely agreed upon. What follows is a citation to the material facts.

[2] Transcript of Motion to Suppress - Day One, *United States v. Pascu*, No. 1:11-cr-10199-DPW-1 (D. Mass. 2011) ("Tr. I") at 6:19-8:10 (initial report), 10:19-11:24 (citizen's confirmation at the scene), 12:21-13:4 (identification at the scene), 14:10-21 (Allen's identification of Defendant in court).

Officer Allen asked Defendant whether he would talk, and Defendant said "Yes."[3]  During

that conversation and also later on, Defendant's story for being at the mall was implausible.

Defendant stated that driven to the mall from New York to meet a woman named Roberta, but he

did not know how she would arrive, did not know her telephone number, did not have her telephone

number in his cellphone, and could not remember at which hotel he had purportedly stayed with her

a few days before.[4]  (In fact, although Roberta was supposedly due at 2:30, she never showed up.[5])

Defendant fared no better with remembering his own circumstances: he purportedly could not

remember his own telephone number, where he had parked his car at the mall, or his address in New

York.[6]  Part of his alibi did not check out: Defendant claimed to have passed some time by looking

at luggage, but security videotapes showed that Defendant had not entered the store.[7]  Defendant's

lack of a coherent story made the agents doubt his veracity.[8]

The circumstances indicated early on that Defendant might be involved with ATM skimming.

By raising his hood and putting on sunglasses when entering the ATM vestibule, and lowering the

hood and taking off sunglasses when leaving the ATM, even though the day outside was sunny, the

police could presume that Defendant intended to obscure his face from ATM surveillance video

---

[3] Tr. I at 13:14-23.

[4] Tr. I at 16:4-17:20, 20:10-23:5 (conversations with Allen); Tr. I at 114:10-17, 122:16-123-1 (conversations with Flynn).

[5] Tr. I at 114:18-22.

[6] Tr. I at 17:21-18:1 (inability to remember where he had parked), 115:9-13 (not knowing his address in New York).

[7] Tr. I at 115:23-116:18 (Flynn's conversation with Defendant and review of T.J. Maxx video surveillance).

[8] Tr. I at 23:6-13 (Allen's finding Defendant's answers "implausible and evasive"), 115:14-20 (Flynn's disbelief that Defendant was waiting for Roberta).

cameras.  Moreover, Defendant's identification documents indicated that he was Romanian, and police had heard that a Romanian gang was skimming ATMs in the area.[9]

As the police's time with Defendant progressed, their concern grew.  Another citizen reported that the ATM had malfunctioned, which Officer Allen understood to be a possible consequence of ATM skimming.[10]  ATM surveillance photos later confirmed that Defendant had been in the ATM.[11]  Both a trained detective and the bank manager thought that the ATM had been tampered with.[12]  Eventually a Secret Service Agent located skimming equipment on the ATM and removed it.[13]

As the police investigated, they spoke with Defendant at length.  They all spoke English to Defendant, and Defendant spoke English to them.  He did not generally appear to have difficulty understanding the officers, and they, despite his accent, did not have difficulty understanding him.  Defendant's English may not have been perfect, but despite defense counsel's efforts to portray it otherwise, the officers and Defendant did not resort to a gesture-based, monosyllabic mode of communication.[14]  The police were consistent on this point, and the details of their conversations

---

[9] Tr. I at 18:8-16 (Allen's seeing Defendant's Romanian passport), 27:9-25 (Allen's familiarity with reports of a Romanian ATM skimming gang).

[10] Tr. I at 32:17-33:24 (Allen's talking to another citizen, whose card was retained by the ATM, which Allen understood to be a problem with ATM skimming devices).

[11] Transcript of Motion to Suppress - Day Two, *United States v. Pascu*, No. 1:11-cr-10199-DPW-1 (D. Mass. 2011) ("Transcript II") at 61:3-63:19 (referring to Gov't's Ex. 4).

[12] Tr. II at 53:2-4, 54:6-12 (O'Connor's impressions upon entering the ATM), 55:6-13 (bank manager's impressions).

[13] Tr. II at 55:14-57:23; Gov't's Ex. 2A-2D (ATM and skimming device photos).

[14] Tr. I at 13:14-23 (Allen's initial request to talk), 16:4-19:21 (Allen's initial conversation and Defendant's ability to converse in English), 20:10-23:5 (Allen's conversation after other officers arrive), 24:8-18 (consent to pat frisk), 34:3-35:4 (Allen's and Price's first request for consent to search Defendant's car, and Defendant's ability to converse in English),

(continued...)

with Defendant were authentic.  The booking videotape excerpt, Government's Exhibit 6, confirms

Defendant's proficiency with English.  During booking, he heard numerous questions in English and

responded in English.  Despite his accent, the booking officers understood his answers, and when

they did not, Defendant spelled his answers, again in English.  The only officer who had difficulty

communicating with Defendant was Officer DeSimone, who spoke to Defendant largely in Italian

(or some approximation of Italian), not English.

Defendant was not frightened.  Rather, he appeared friendly and smiled for a detective's

photograph without prompting.[15]  Throughout his conversations with police, Defendant was not in

---

[14](...continued)
40:12-41:12 (Allen's and Price's second request for consent to search Defendant's car), 53:11-
54:15, 62:20-63:19 (Allen's initial conversation), 66:3-68:15 (Allen stating that Defendant used
English, did not rely solely on gestures, and spoke in understandable sentences), 80:1-6 (Allen
resisting defense counsel's characterization of "broken English"), 108:10-20 (Allen stating that
Defendant consented to search the car both times by both nodding and giving verbal consent in
English), 113:10-123:1 (Defendant's lengthy conversation with Flynn about his use of the ATM
and his hood, Roberta, where he was staying, his having looked at luggage at the mall,
Defendant's family, his wife's Greek restaurant in Germany, his employment in construction
(and subsequent claim not to understand the word "construction"), cars, rap music, the Gipsy
Kings, Flynn's misspelling of the band as "Gypsy Kings" during a Google search, Defendant's
parking violation in Boston, his inability to recall the hotel he had stayed at in Boston), 123:9-24,
124:17-23 (Flynn's surprise that Defendant requested an interpreter back at the station, because
Defendant had conversed easily in English at the mall, and Defendant's purported lesser ability to
speak in English at the station), 135:14-137:7 (Flynn stating that he and Defendant spoke in
English, that Defendant could not understand Flynn only when Flynn used the word "bambino"
and the second time Flynn used the word "construction," and that Defendant "communicated
very effectively, and he told stories.  So, he communicated just fine."); Tr. II at 8:24-9:1, 9:17-
11:23 (Price relating officers' conversation with Defendant and that Defendant's English became
clearer over time), 15:14-16:2 (Price's and Allen's obtaining consent to search the car the first
time), 19:15-20:11 (Price's and Allen's obtaining consent to search the car the second time),
35:5-20 (Price disagreeing with defense counsel's suggestion that Defendant responded to
questions in a manner suggesting that he did not understand them).

[15] Tr. I at 24:19-20 (not frightened), 120:12-16 (appeared friendly, personable, and not
afraid); Tr. II at 58:11-25 (discussing Gov't Ex. 3, and Defendant's smile).

custody, was not handcuffed, was not placed in the back of a police car or otherwise restrained.[16] No weapons were drawn.[17]  He was allowed to stand or kneel, as he wished, and he was offered water, which he declined.[18]  He never asked to leave.[19]

The car was searched four times.

The first search was performed without a warrant and likely without Defendant's consent.[20] During this search, Officer Matt Price, an appellate lawyer, arrived and asked whether the searching officers had consent.  When Officer Price learned that they did not, he suggested that they stop and obtain consent.  The search ceased.[21]  The Government will not rely on this search at trial.

At around this time, police pat-frisked Defendant and read him his *Miranda* rights.[22]  Officers Price and Allen then asked for Defendant's consent to search the car. [23]  They asked in English. Defendant appeared to understand and responded to with a nod and verbal assent, also in English.[24]

---

[16] Tr. I at 28:20-29:2, 40:25-41:7; Tr. II at 19:1-14.

[17] Tr. I at 108:7-9; Tr. II at 19:3-4, 11-14.

[18] Tr. I at 42:20-43:5, 107:22-108:6.

[19] Tr. I at 81:3.

[20] Although one officer thought that someone else had said that Defendant had consented to this search, the Government concedes for the sake of argument that the officer was mistaken.

[21] Tr. II 5:7-16 (Price's qualification for and work as an appellate attorney), 13:1-15 (Price asking searching officers whether they had consent because "I thought it was important for us to be able to search the car with his consent"), 14:18-15:9 (recounting that after the officers said that they did not have consent, they shut the car and left it alone, at Price's suggestion).

[22] *See* Mem. in Supp. of Def's Mot. to Suppress at 3-5 & n.2 [Dkt. #31].

[23] Tr. II at 19:15-20.

[24] Tr. II at 15:6-16:2 (Price's testimony); Tr. I at 34:3-35:4, 83:16-84:3 (Allen's testimony).

Again, Defendant was not in custody and he did not appear frightened.  Nor was Defendant told about the first search or anything found during the first search.[25]

After Defendant gave consent, Officers Price and Allen performed the second search.[26] Because that search was unfruitful, Officer Allen exercised caution by questioning the reporting citizen, who reconfirmed his report and identification.[27]

Although Officers Price and Allen still had consent to search the car, they nevertheless asked again for his consent out of an abundance of caution.[28]  Defendant consented (in English) once again.[29]  Officers Price and Allen then searched the car again.  This was the third search.

After the third search, Defendant was handcuffed, arrested, and transported to the police station.[30]  Nobody else was immediately available to take care of the car.  Defendant was alone.  He

---

[25] Defendant concedes that "[n]o one told [Defendant] the car keys had already been used to open his car or that a search had already been conducted.  No one told him the notebook page with the list of addresses had already been seized from the glove compartment." Mem. in Supp. of Def't's Mot. to Suppress [Dkt. # 31] at 5 (transcript citations omitted).  The Government agrees.

There was some confusion over whether officers took any pieces of paper from the first search and gave them to a detective.  Whether they had or not is immaterial, because Defendant concedes that he was shown nothing from the first search.

[26] Tr. I at 36:2-37:13 (Allen); Tr. II at 16:3-17:9 (Price).

[27] Tr. I at 38:1-25.

[28] Tr. I at 100:8-25 (Allen). See especially Tr. I at 100:23-25 ("Q [by defense counsel]: You didn't really need to ask permission again, did you? A: I just wanted to make sure that we had permission again from Mr. Pascu to search his vehicle.").

[29] Tr. I at 108:15-20 (Allen).

[30] Tr. II at 63:19-23 (O'Connor).

said that he had driven from New York to Cambridge alone.[31]   The car's owner was unavailable

because he was located in New York.[32]  Roberta was unavailable because she had not showed up.[33]

His wife was unavailable because she was in Romania.[34]  There is no evidence that Defendant asked

the police to turn the car over to anyone else.

The car was then towed to the Cambridge police station, where Cambridge police conducted

an inventory search pursuant to and consistent with Cambridge's inventory search policy.  They did

so to protect themselves against any later claims for lost property.  During this inventory search,

police found additional evidence of Defendant's guilt.[35]

## ARGUMENT[36]

### I.    OFFICER ALLEN'S INITIAL CONVERSATION WITH DEFENDANT WAS NEITHER A *TERRY* STOP NOR AN ARREST, BUT RATHER CONSENSUAL

Defendant has misanalyzed Officer Allen's initial encounter with Defendant as a *Terry* stop,

when in fact it was a consensual conversation.  Officer Allen did not force Defendant to stop, but

merely asked him whether he would talk, to which Defendant said "Yes."  This and the ensuing

conversation about who Defendant was and why he was at the mall did not constitute a seizure, and

---

[31] Tr. I at 16:22-17:20 (Allen's initial conversation with Defendant).  ATM video surveillance and a passport in the car indicated that Defendant had been joined by codefendant Moiceanu, a Romanian national who has not yet been apprehended.  Tr. II at 59:17-60:13.

[32] Tr. II at 51:13-52:1 (O'Connor's testimony about CJIS records).

[33] Tr. I at 114:18-22 (Flynn).

[34] Tr. I at 117:10-13 (Flynn).

[35] Tr. II at 63:19-67:6 (inventory search and inventory search policy); Gov't Ex. 5 (Cambridge inventory search policy).

[36] Throughout the argument, the Government will rely on the facts cited above, and will cite to the transcripts only if not cited to above.  The Government incorporates all arguments made in its opening brief.

therefore did not trigger the protections of the Fourth Amendment.  *See United States v. Smith*, 423

F.3d 25, 30 (1st Cir. 2005) (2-1) (reversing district court and holding that no seizure occurred when

two uniformed officers got out of their police cars, approached defendant, and questioned him, but

did not draw their weapons and did not touch him), *cert. denied*, 547 U.S. 1149 (2006).  Officer

Allen *asked* to talk with Defendant, but did not demand compliance in word, manner, or deed.

Defendant complied voluntarily.  He was not in custody, not restrained, or even yelled at.  No

weapons were drawn.  Thus, the initial encounter was not a *Terry* stop.

## II.     THE CITIZEN'S REPORT GAVE OFFICER ALLEN REASONABLE SUSPICION OF DEFENDANT'S CRIMINAL ACTIVITY, A SUSPICION WHICH GREW THROUGHOUT THE ENCOUNTER

Even if Officer Allen's initial query of Defendant did constitute a *Terry* stop     despite First

Circuit precedent     the stop comported with the Fourth Amendment because there was a reasonable

suspicion that Defendant was involved with criminal activity.  To conduct an investigative *Terry*

stop, the detaining officers must have a "reasonable, articulable suspicion that criminal activity is

afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Officer Allen had a reasonable suspicion of

Defendant's involvement in criminal activity the moment the citizen reported Defendant's behavior

and identified him.  There are no good reasons to put on a hood and sunglasses in an indoor ATM

vestibule but remove them outdoors in the sun.  Officers had already heard of an ATM skimming

group in the area.  Consequently, officers had reasonable suspicion that Defendant was tampering

with the ATM and donning his sunglasses and hood in the ATM to obscure his face from any video

surveillance camera.

The longer police talked to Defendant, the more reasons Defendant gave for being suspicious.

It was more suspicious that Defendant was Romanian, because the ATM skimming gang officers had

heard of was Romanian.  It was more suspicious that Defendant claimed to have driven alone from

New York to Cambridge to meet a woman at a mall without knowing how she would arrive and without knowing her telephone number or keeping her number in his cellphone.  (Who would drive hours to meet someone without any way to contact her?)  It was more suspicious that Defendant could not remember the name of the hotel at which he and Roberta had supposedly stayed just a few days before.[37]  It was more suspicious that Roberta never showed up at the mall.[38]  It was more suspicious that Defendant could not remember his own telephone number, where he had parked his car at the mall, or where he was staying in New York.[39]  It was more suspicious that Defendant claimed to have looked at luggage, but security videotapes revealed that Defendant had not actually visited the store with luggage.[40]  It was more suspicious that a trained detective and the bank manager both thought that the ATM looked to have been tampered with.[41]  It was more suspicious that another citizen told the police that the ATM had malfunctioned by eating her card, a problem with ATM skimming devices.[42]  It was more suspicious that when Defendant finally "remembered" Roberta's telephone number, it rang back to a construction company.[43]  It was more suspicious that

---

[37] Tr. I at 16:4-17:20, 20:10-23:5 (conversations with Allen); Tr. I at 114:10-17, 122:16-123-1 (conversations with Flynn).

[38] Tr. I at 114:18-22.

[39] Tr. I at 17:21-18:1 (inability to remember where he had parked), 115:9-13 (not knowing his address in New York).

[40] Tr. I at 115:23-116:18 (Flynn's conversation with Defendant and review of T.J. Maxx video surveillance).

[41] Tr. II at 53:2-4, 54:6-12 (O'Connor's impressions upon entering the ATM), 55:6-13 (bank manager's impressions).

[42] Tr. I at 32:17-33:24 (Allen's talking to a citizen whose card was retained by the ATM, which Allen understood to be a problem with ATM skimming devices).

[43] Tr. I at 113:10-123:1 (Flynn's lengthy conversation with Defendant about his use of the
(continued...)

Defendant claimed to have worked in construction, but then disclaimed knowing the word "construction" when Roberta's number rang back to a construction company. Finally, it was more suspicious when the Secret Service found the skimming devices on the ATM.

The police's reasonable suspicions started with the citizen's report, and grew with these additional facts. Their suspicions were reasonable from the start, and they grew more numerous as time progressed. To claim otherwise should beg disbelief.

## III.   THE CONSENSUAL CONVERSATION DID NOT TRANSFORM INTO A *TERRY* STOP UNTIL THE PAT-FRISK, OR INTO AN ARREST UNTIL HANDCUFFING

The police's consensual conversation with Defendant did not transform into a seizure until he was pat-frisked, at which point it became a *Terry* stop. "To constitute seizure, this Circuit requires one's liberty be restrained by either physical force or an assertion of authority." *United States v. Ford*, 548 F.3d 1, 4 (1ˢᵗ Cir. 2008), *cert. denied*, 130 S. Ct. 54 (2009). The first assertion of authority or instance of physical force that Defendant identifies is the pat-frisk. The Government concedes that the pat-frisk transformed the encounter into a *Terry* stop.

But the pat-frisk did not transform the encounter into a *de facto* arrest:

> There exist no scientifically precise benchmarks for distinguishing between temporary detentions and de facto arrests. Instead, we inquire, in light of the totality of the circumstances, whether a reasonable person in the suspect's position would have understood her position to be tantamount to being under arrest. This objective, suspect-focused inquiry is informed by our assessment of the reasonableness of the detaining officer or officers' actions in response to developing conditions. *Where an investigatory stop is justified at its inception, it will generally not morph into a de facto arrest as long as the actions undertaken by the officers following the stop were*

---

[43](...continued)
ATM and his hood, Roberta, where he was staying, his having looked at luggage at the mall, Defendant's family, his wife's Greek restaurant in Germany, his employment in construction, and subsequent claim not to understand the word "construction").

> *reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop.*

*United States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011) (emphasis added) (citations, internal quotation marks, and alterations in original omitted).  Police have acted much more aggressively than they did here without converting an investigative *Terry* stop into a *de facto* arrest.  For example, in *Chaney*, the First Circuit held that police officers did not turn a *Terry* stop into a *de facto* arrest by entering the defendant's motel room with guns drawn, ordering him on the ground, and then handcuffing him.  *Id.* at 408-11.  And in *United States v. Taylor*, 162 F.3d 12, 21 (1st Cir. 1998), the First Circuit held that police officers did not turn a *Terry* stop into a *de facto* arrest by drawing their weapons, having ten to twelve officers on the scene, blocking the defendant's car's ability to leave, and placing the car's occupants face-down on the ground and pat-frisking them.

Defendant's experience was far milder.  There were fewer officers (five), no weapons were drawn, and Defendant was not handcuffed or placed on the ground.  The pat-frisk transformed the encounter into a *Terry* stop, not a *de facto* arrest.

Nor did police transform the *Terry* stop into a *de facto* arrest by holding on to Defendant's passport, car keys, and cellphone.  To argue to the contrary, Defendant cites only to *Florida v. Royer*, 460 U.S. 491 (1983).  *See* Mem. in Supp. of Def's Mot. to Suppress at 11.  In *Florida v. Royer*, the Supreme Court held that law enforcement officers exceeded the bounds of a *Terry* stop at an airport by taking the defendant's checked luggage without his consent, retaining his driver's license and airplane ticket, and relocating him to a small, windowless room like a large closet.  460 U.S. at 508-09 (Powell, J., concurring).  But *Florida v. Royer* is inapposite.  According to the First Circuit, *Terry* stops at airports are distinguishable from those occurring on the public streets: "We think the concerns of the airport cases, where citizens need documentation to move from place to place, differ

from the instant case where [the defendant] was on foot on a public street." *United States v. Ford*, 548 F.3d at 6. On a public street, taking the defendant's license "is an important factor in our analysis," but the First Circuit "decline[s] to elevate it above other considerations." *Id.* In this case, Defendant encountered police on the sidewalk in an outdoor strip mall, not at an airport, and he was not relocated to a smaller, windowless, confined space, as in *Florida v. Royer*. Moreover, all of the other aspects of this encounter (no custody or restraints; nonhostile questions; easy and extended conversation between Defendant and police about his family, cars, and music; Defendant's unsolicited smile for the camera) indicate that Defendant's will and liberty were not overcome until he was formally handcuffed and arrested.

The length of the encounter did not transform it into a *de facto* arrest. *See* Mem. in Supp. of Def's Mot. to Suppress at 11-12. "[T]ime of detention cannot be the sole criteria for measuring the intrusiveness of the detention." *United States v. McCarthy*, 77 F.3d 522, 530 (1st Cir. 1996). The test of "whether a detention is too long in duration to be justified as an investigative stop" depends on "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). The district court should first "determine whether the officers' actions were justified at their inception, and if so, whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." *United States v. Owen*, 167 F.3d 739, 748 (1st Cir. 1999) (citations, internal quotation marks, and alterations omitted). The district court "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Sharpe*, 470 U.S. at 686.

12

Here, the police "diligently" investigated in a manner "likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant," *see Sharpe*, 470 U.S. at 686, and they acted "reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop," *see Owen*, 167 F.3d at 748. The encounter began as a consensual conversation about Defendant's implausible explanations about where he had come from and what he was doing. When additional officers arrived, they searched the parking lot for a shoulder bag and sunglasses.[44] After not finding them in the parking lot, officers asked for consent to search Defendant's car. He consented, and Officers Price and Allen did a quick search.[45] After that search proved unfruitful, Officer Allen tried to determine whether he had the right suspect by reconfirming the reporting citizen's report and identification of Defendant. With that reconfirmation, Officers Price and Allen obtained Defendant's consent to search again; they didn't need to do so, but did so anyhow out of an abundance of caution. They searched the car yet again. At some point, Officer Allen interviewed another citizen about the ATM, and she told him that it had eaten her bank card. This strengthened suspicions that Defendant had been involved in ATM skimming. At some point, Officer Price called for detectives to continue the investigation.[46] After the detectives arrived, Detective Flynn talked with Defendant for an extended period. During their conversation, Detective Flynn tested Defendant's alibi, tried to contact Roberta for him, and found his story unlikely. Detective O'Connor checked the registration of Defendant's car back at the station house. Upon arriving at the scene, Detective O'Connor looked over the ATM.

---

[44] Tr. II at 7:22-8:11 (Price); Tr. I at 19:22-20:2 (Allen).

[45] Tr. II at 16:3-17:9 (Price, describing first consensual search of the car for a shoulder bag as taking "[a] couple of minutes").

[46] *See* Tr. II at 42:6-10 (Price).

He found it suspicious, so he called bank personnel and asked them to confirm his suspicions.  After the bank manager showed up and agreed that the ATM looked suspicious, the police called the Secret Service to look for skimming equipment on the ATM.  Detective O'Connor also reviewed video surveillance photos for evidence that Defendant had been in the ATM.

The police acted reasonably to address the stop's original justification and the additional information they gleaned during the stop. *See Owen*, 167 F.3d at 748.  They gathered information, confirmed it, checked out Defendant's evasive story, interviewed other citizens, and sought help from other law enforcement officers based on what they learned.  Though the police might have been disorganized, they responded to circumstances and new information gleaned along the way in a responsible, searching way.

All this took time.  Contributing to the length were Defendant's evasive answers, the recency of the crime, and the likelihood that Defendant would depart the jurisdiction, all of which justified a longer detention. *See McCarthy*, 77 F.3d at 531-32.  Defendant's evasive alibi made no sense, and had to be investigated.  The crime had just occurred, increasing the likelihood of finding fresh evidence.  And since Defendant was a foreign national staying in New York, he was highly likely to leave the jurisdiction right after release.

Against all this, the Court should consider that the intrusion on Defendant was minimal.  Again, he was not restrained in any way except during a brief pat-frisk.  Nobody yelled or pointed a weapon at him.  As proof, he was friendly, chatted about mundane matters such as music, cars, and adultery, and smiled for a photograph without prompting.  Officer Allen offered Defendant water.  There is no evidence that the amount of time overcame his will or otherwise created a *de facto* arrest.

## IV.   THE UNITED STATES WILL NOT RELY ON THE INITIAL SEARCH THAT WAS LIKELY CONDUCTED WITHOUT CONSENT

The Government agrees with Defendant that the very first search of Defendant's car was likely conducted without his consent.  That search might have been constitutional because of the automobile exception.  However, the Court need not decide this issue, because the United States will not rely on the initial search at trial.[47]

## V.   DEFENDANT VALIDLY CONSENTED TO THE LATER SEARCHES AT THE MALL

"In order for consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and voluntarily." *United States v. Jones,* 523 F.3d 31, 37 (1st Cir. 2003).

### A.   Defendant Twice Consented to the Later Searches Freely and Voluntarily

Surprisingly, Defendant still contends that his English was too poor to consent to the searches of his car.  There was no evidence of this.

Despite Defendant's best efforts, nobody testified that Defendant responded inappropriately, in monosyllables, or only with crude gestures.  Rather, multiple officers confirmed that Defendant understood English, responded appropriately in English to questions posed in English, and conversed in English on a number of topics.  In the booking video, Defendant listened to questions in English, and responded appropriately in English.  Any difficulty in communications likely arose from trying to talk through a protective plate-glass window.  But even then, Defendant clarified by spelling in English.

---

[47] If officers took any evidence from the car during that initial search, that evidence would still be admissible as inevitable discovery during the later searches that are valid on the doctrines of consent, the automobile exception, the inventory search, and the search incident to arrest.

Consequently, Defendant's assertions that he could speak English with only "a few words" and by "making myself understood by gestures," Pascu Aff. ¶ 2, are false. So are Defendant's assertions that he "never gave permission to anyone to open the car or search the car." Pascu Aff. ¶ 5. He spoke English fine before, during, and after he gave consent.

Defendant's claim that police should have warned him of his right to refuse consent is a red herring. Police had no such obligation, and omitting this warning did not render Defendant's consent invalid. *United States v. Chaney*, 647 F.3d 401, 407-08 (1st Cir. 2011). Moreover, the police *did* advise Defendant of his *Miranda* rights before seeking consent. Doing so essentially conveyed that Defendant had no obligation to cooperate, which increases the Government's proof that Defendant consented freely and voluntarily. *See United States v. Jones*, 523 F.3d 31, 37 (1st Cir. 2008).

Moreover, there was no evidence that police acted to overbear Defendant's free will. They asked for consent; they did not demand it. They did not yell, restrain him, or withhold food or water. Their conversations were polite and spanned the minutiae of life. They were civil.

The simplest proof of Defendant's free and voluntary consent in good English can be found in the actions of Officer Price, the appellate lawyer who stopped the initial search and sought Defendant's consent twice. Had Defendant refused or been unable to comprehend English sufficiently, then why would Officer Price have asked for consent twice and then searched the car twice? If Officer Price had intended to ignore Defendant's wishes, he would not have asked for consent in the first (or second) place.

The Government has proved by a preponderance of the evidence that Defendant gave consent freely and voluntarily.

**B.     The Initial Warrantless Search Did Not Taint Either of Defendant's Consents, Because He Did Not Know of the Initial Search**

The initial warrantless search (the one interrupted by Officer Price) did not taint Defendant's later grants of consent.

"When consent follows an illegal act by the police - whether seizure of a person or search of property - the requirement that consent be voluntary is supplemented by a second distinct requirement: that the consent be purged of the taint of the earlier illegal act." *United States v. Goodrich*, 183 F. Supp. 2d 135, 145 (D. Mass. 2001) (Woodlock, D.J.). "Under the 'attenuation' exception to the exclusionary rule, evidence that is in some way the product of illegal police conduct may be admitted if it has become so distanced from the underlying illegal police conduct as to dissipate the taint of the illegal search or seizure." *Goodrich*, 183 F. Supp. 2d at 145.

To allege a taint, Defendant would have to allege that his consent was "the product of" the initial warrantless search. *Id.* Yet even Defendant concedes that "[n]o one told him the car keys had already been used to open his car or that a search had already been conducted." *See* Mem. in Supp. of Def's Mot. to Suppress at 5. How could his consent be "the product of" the initial warrantless search, when he knew nothing of it? Without that knowledge, the consent was not a product of the initial search, and there was no taint.

*Goodrich* is a good counterpoint. In *Goodrich*, the defendant knew of the earlier illegal search and thus believed that withholding consent would be pointless. *Id.* at 148. Likewise, in both of the cases that Defendant cites, *United States v. Santa*, 236 F.3d 662 (11th Cir. 2000), and *Holloway v. Wolff*, 482 F.2d 110 (8th Cir. 1973), the defendants also knew of the earlier illegal action.

But here, in contrast, Defendant was ignorant of the earlier search. Even if evidence had been taken from the first search, it was not shown to Defendant. His consent was not tainted.

C.     **Even Had There Been a *De Facto* Arrest, Defendant's Consent Was Originally Obtained Early On, While He Was Still In An Investigative *Terry* Stop**

The Court should also reject Defendant's mistaken claim that his consent was invalid because it was obtained after an illegal *de facto* arrest.  To begin with, as argued above, there was no *de facto* arrest.  The only arrest occurred at the end of Defendant's encounter, when he was handcuffed.

But even if the encounter morphed into *de facto* arrest before handcuffing, the police obtained Defendant's consent to search the car well before that time.  Defendant first gave consent right after Officer Price saw the initial search and learned that officers lacked consent.  When did this occur?  Within 13 to 18 minutes of Defendant's meeting Officer Allen.  Consider the timing of Officer Rivera's movements.  He arrived at the mall "[w]ithin a few minutes" of Officer Allen's initial conversation with Defendant.  *See* Mem. in Supp. of Def's Mot. to Suppress at 2.  After Officer Rivera arrived, he went to search the car, stopped after Officer Price raised the consent issue, then searched through trash cans, and then was called away to another incident.[48]  He was at the mall for only *10 to 15 minutes*.[49]  Officer Price obtained Defendant's consent right after talking to Officer Rivera.[50]  Because Officer Rivera was at the mall for only 10 to 15 minutes and had arrived only a few minutes after Officer Allen first engaged Defendant, Officer Price therefore obtained Defendant's consent early on, around 13 to 18 minutes after Defendant encountered Officer Allen.

Given all that the police were accomplishing when they first sought his consent, *see supra*,

---

[48] Tr. II at 85:18-24 (going to the car), 88:19-20 (spending five minutes searching the car), 91:7-19 (Officer Price questioning about consent), 92:17-93:4 (ceasing the search of the car and switching to trash cans), 94:1-8 (being called away to another place for a domestic dispute).

[49] Tr. II at 94:7-8 ("Q: How long a period of time were you at the scene?  A: 10, 15 minutes.").

[50] Tr. II at 14:18-15:9 (Price).

there was no *de facto* arrest, only an investigative *Terry* stop.  And since Defendant never revoked

his consent, any subsequent searches were covered by this first consent.[51]

## VI.   THE POLICE HAD AUTHORITY TO SEARCH THE CAR EVEN WITHOUT DEFENDANT'S CONSENT

### A.   The Automobile Exception

In addition to being lawful under the doctrine of consent, the searches were also lawful under

the automobile exception.  As the Court is aware, and as argued in the Government's opening brief,

the police may search a car without a warrant if they have probable cause to believe that the car

contains evidence of criminal activity.

Police had probable cause to search Defendant's car early on.  The reporting citizen reported

Defendant for acting suspiciously while moving between the ATM and his car.  Officer Allen

quickly learned that Defendant's story for being at the mall was implausible.  Officer Allen also

quickly learned from Defendant's passport that he was Romanian.  Officer Allen had heard of a

Romanian ATM skimming gang in the area.  Thus, after just a few minutes, Officer Allen had

probable cause to believe that criminal activity was afoot and that relevant evidence (skimming

equipment, money, bank cards, maps, the bag and sunglasses, etc.) might be found in the car.  Note

that none of these facts giving probable cause came from inside the car itself.

After this, probable cause grew and grew.  Officer Allen learned from another citizen that

---

[51] Defense counsel conceded as much at the hearing.  *See* Tr. I at 100:16-23 (cross-examining Allen).  *See especially id.*:

> Q:     Well, you already had permission to go in the car and you
>        had already been in the car, am I correct?
>
> A:     That's correct.
>
> Q:     You didn't really need to ask permission again, did you?

the ATM had malfunctioned by retaining her bank card, increasing his suspicion that a skimming device had been attached. His concerns were confirmed by Detective O'Connor, who examined the ATM and suspected that it had been altered, and then by the bank manager, who did the same. Their concerns were later confirmed by ATM surveillance footage that showed Defendant in the ATM vestibule, and later by the Secret Service Agent who located and removed the skimming device.

At any of these points, the police had probable cause to believe that a crime had occurred and that relevant evidence might be found in the car. Again, none of this came from inside the car.

Because the police and Secret Service had probable cause to believe that evidence would be found in the car without basing that conclusion on evidence found within the car, they had authority to search it without a warrant.

**B.      Search Incident to Arrest**

The same analysis applies to the doctrine of searching the car incident to arrest. For the reasons given above, the police and Secret Service had probable cause to arrest Defendant without basing that conclusion on evidence found within the car. They therefore had authority to search the car incident to Defendant's arrest. (Again, this Court is sufficiently familiar with the legal principles that there is no reason for the Government to repeat its opening brief's discussion of the law here.)

**C.      The Inventory Search**

Although Defendant correctly states that authority to arrest a suspect does not necessarily confer authority to tow his car, his analysis of the specific facts and cases is inadequate. He wholly omits discussion of First Circuit cases on point.

Police do not need a warrant to tow a defendant's car for community caretaking purposes. *United States v. Coccia* 446 F.3d 233, 238 (1st Cir. 2006). The decision to tow can be upheld even if made in absence of standardized procedures. *Id.* at 238-39. The decision will be upheld if it "was

reasonable under the circumstances." *Id.* at 239. For example, police may tow a car if the car's driver will be detained for "an indeterminate, and potentially, lengthy period," the car could be a possible target of theft or vandalism, and there was "no one [else] immediately available to take the car." *Id.* at 240.

The decision to tow here was reasonable. After arresting Defendant with probable cause, police had no idea how long he might be detained: the arrest came on a Saturday night and he was a foreign national. Abandoning the car in an open-air parking lot with no other custodian on a Saturday night could have made the car a target of theft or vandalism.

Again, this Court's decision in *Goodrich* poses a useful counterpoint to the present case. In *Goodrich*, this Court held that after police arrested the defendant, they acted unconstitutionally by towing and then searching the defendant's car rather than turning the car over to the defendant's wife, who was at the scene and had the keys. *Goodrich*, 183 F. Supp. 2d at 143-44.

Here, the circumstances were much different. Here, Defendant had no one else immediately able to take care of the car. Defendant was alone. He had purportedly driven to Cambridge alone. The car's owner was unavailable because he was located in New York. Roberta was unavailable because she had not showed up. His wife was unavailable because she was in Romania. There is no evidence that Defendant even asked the police to have anyone else take possession of the car.

Nor can Defendant argue that the decision to tow was improper because the police did not give him a chance to call somebody else to pick up the car. *Coccia*, 446 F.3d at 240 n.7. The police have no obligation to do so. *Id.* *See also United States v. Mensah*, F. Supp. 2d , 2011 WL 2489943 at *3 (D. Mass. Jan. 17, 2011) (Gorton, J.) (rejecting defendant's argument that troopers should allowed him to call his girlfriend to retrieve his car, citing *Coccia*).

Defendant also cannot argue that the decision to tow was improper because the care was in

a private lot and the car was not blocking traffic. *Coccia*, 446 F.3d at 241 n.9 (rejecting argument).

## VI.     THE POLICE ACTED IN GOOD FAITH

Even if the Court found some constitutional error, the searches done after gaining Defendant's consent should be upheld because they were made in good faith. Throughout, police treated Defendant civilly, offering him water and chatting with him. They also acted on the advice of an appellate lawyer on the scene. They asked for consent twice. They confirmed the reporting citizen's story and identification twice. They were trying to do the right thing. They acted in good faith.

## CONCLUSION

For all the reasons given in above and in the Government's opening brief, Defendant's motion to suppress should be denied.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: */s/ Scott L. Garland*
SCOTT L. GARLAND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that this document was filed on the date listed below through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

*/s/ Scott L. Garland*
SCOTT L. GARLAND
Assistant United States Attorney

Dated: November 14, 2011